**SKYLINE DISTRIBUTORS, a Division of Acme Markets, Inc., Petitioner**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 95–1571.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 24, 1996.

Decided Nov. 8, 1996.

Robert J. Bray, Jr., Blue Bell, PA, argued the cause and filed the briefs for petitioner.

David S. Habenstreit, Attorney, National Labor Relations Board, Washington, DC, argued the cause for respondent, with whom Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Peter D. Winkler, Supervisory Attorney, were on the briefs. Linda Dreeben, Supervisory Attorney, Washington, DC, entered an appearance.

Before: EDWARDS, Chief Judge,
HENDERSON and TATEL, Circuit Judges.

Opinion for the Court filed by Chief Judge
EDWARDS.

Concurring opinion filed by Circuit Judge
HENDERSON.

HARRY T. EDWARDS, Chief Judge:

This petition for review, brought by Skyline Distributors ("Skyline" or "petitioner"), a Division of Acme Markets, Inc. ("Acme"), raises the question of whether an employer, who is guilty of no other unfair labor practices ("ULPs"), can be required by the National Labor Relations Board ("Board" or "NLRB") to recognize and bargain with a union solely on the basis of having granted economic benefits to employees who first seek and then reject union representation. Underlying this petition is the long debated issue over the impact of economic inducements given by employers during union representation campaigns. Although some studies have suggested that there is no good basis for the belief that a grant of benefits by itself leads employees to infer a threat of reprisal if they opt in favor of unionization, the Supreme Court ruled otherwise in *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409–10, 84 S.Ct. 457, 459–60, 11 L.Ed.2d 435 (1964) (holding that an employer giving employees economic inducements that are timed to affect employees' choice for or against unionization constitutes an ULP under Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1)). Nonetheless, even assuming that the grant of benefits may be an ULP, it does not follow that unlawful economic inducements *alone* justify a bargaining order under *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). That is the question now before this court.

In the instant case, Skyline first declined to bargain with agents from District Lodge No. 98, International Association of Machinists & Aerospace Workers, AFL–CIO ("IAM"), who sought to represent a small unit of maintenance employees at the company's otherwise heavily unionized warehouse operation. Company officials then announced to the employees that management had decided to lift a wage freeze and restructure wages, thus, effectively granting a wage increase to the maintenance workers. Although the company's decision to lift the wage freeze was made before the advent of the union campaign, the Board held that it was ill-timed, found that it constituted an ULP, and ruled that the employer was required to bargain under *Gissel*. See *Skyline Distributors, a Division of Acme Markets and District Lodge No. 98*, 319 NLRB No. 44, 1995 WL 610401 (October 16, 1995)(hereinafter *Skyline Distributors*), *reprinted in* Appendix ("App.") 32.

Although we adopt no *per se* rule, and we do not mean to say that a *Gissel* bargaining order can *never* issue solely on the basis of economic inducements, we find no basis for a bargaining order on the record in this case. Under *Gissel*, absent "outrageous and pervasive ULPs," of which there are none here, the Board may issue a bargaining order only if it is found that an employer's ULPs had a tendency to undermine the union's majority status and impede the election process, *and* the Board determines that the possibility of erasing the effects of the unlawful conduct and ensuring a fair election by the use of traditional remedies is slight and would be better protected by a bargaining order. The Board has not come close to satisfying this standard. It is not just that the Board has failed to justify its position; rather, on this record, we find that there is no way that the Board can find substantial evidence justifying a *Gissel* bargaining order.

We grant the Board's cross-petition for enforcement of its determination of an appropriate bargaining unit and its findings that Skyline's economic inducements constituted ULPs. However, we grant Skyline's petition for review on the *Gissel* bargaining order, reversing on this point and remanding the case to the Board for further proceedings.

## I. BACKGROUND

Skyline, a division of Acme, a large mid-Atlantic based supermarket chain, employs about 200 people in a warehouse in Lancaster, Pennsylvania. The warehouse serves as a distribution center for Acme. Approxi-

mately 90% of Skyline's employees are affiliated with a union; however, the maintenance and sanitation area, composed of 16 employees—seven maintenance and nine sanitation—is not unionized.

During early 1992, some of Skyline's maintenance employees expressed displeasure with their pay scale. Members of management were pressed by the employees to restructure wages, on the claim that maintenance employees with significant seniority were being underpaid. The maintenance supervisor was sympathetic to the employees' plight and forwarded their complaints to senior management. However, these initial complaints drew no response from top management.

Two other issues fueled the employees' discontent. In January of 1992, Acme announced that employee copayments for health insurance benefits would increase. Subsequently, on February 17, 1992, Skyline management imposed a wage freeze on all salaried employees, and then the Skyline Salary Administration Division mistakenly applied the wage freeze to the maintenance workers and other non-union, hourly-paid employees. The maintenance employees complained about being covered by the wage freeze, but their objections appeared to fall on deaf ears.

In fact, however, company officials were acutely aware of the problem over the mistaken application of the wage freeze. Labor Relations Vice President Bailey testified that

> soon after the freeze was announced in February, complaints from hourly paid workers about it quickly came to management's attention. Facing increasing discontent, Respondent's president met with the executive committee, including DiBernardino, sometime in April, and decided that the wage freeze policy should apply to management, but not to unrepresented, hourly paid workers. By memo dated April 30, the salary administration division was advised that "Non-union Clerical and Maintenance Wage" employees ... "will not be subject to the 1992 management wage freeze."

*Skyline Distributors* at 3–4, *reprinted in* App. 34–35. The Board specifically found

that "[t]he truth, as Bailey's testimony and [Skyline's] exhibit show, is that the decision to correct the wage freeze error came about sometime before April 30." *Id.* at 7, *reprinted in* App. 38. The maintenance employees, however, were initially unaware of management's decision to lift the wage freeze.

Acting in obvious frustration over management's apparent failure to lift the wage freeze on non-union, hourly-paid employees, the maintenance employees contacted Clark Ruppert, a business representative of IAM, to inquire about their joining the union. An initial meeting between the employees and the IAM agent was set for May 9, 1992.

Six of the seven maintenance employees attended the May 9 meeting. They voiced their complaints about the wage freeze, the wage scale, increasing health insurance co-payments, and other working conditions. All of the employees present at the meeting then signed union authorization cards, indicating that they wished the union to serve as their collective bargaining representative. They also agreed to let Ruppert present the signed cards to Skyline management in order to gain recognition in a bargaining unit covering the maintenance employees.

On May 12, 1992, three days after the initial union meeting, Ruppert, along with two of the maintenance employees, presented the signed authorization cards to Ralph Armold, Skyline's plant manager, and requested that the employer voluntarily recognize the union. Armold indicated that he had no authority to recognize the union, but stated that he would pass the request along to Skyline's Labor Department.

The next day, Skyline's Vice President of Distribution, William DiBernardino, and Skyline's Vice President of Labor Relations, Bill Bailey, drove 45 miles from their offices to the Skyline warehouse, where they met with the seven maintenance employees. Armold and maintenance supervisor Ron Krystyniak also attended the meeting. DiBernardino invited the employees to air their grievances, which they did, voicing the same complaints that they had shared with Ruppert during the May 9 union organizational meeting. DiBernardino told the employees that Skyline

could do nothing about the rising health insurance copayments. However, he explained to the employees that a communications snafu with the Salary Administration Division had caused company officials mistakenly to freeze the wages of non-union, hourly-paid employees. DiBernardino advised the employees that a decision already had been made to correct the mistake and lift the wage freeze affecting non-management, hourly-paid employees. Later that day, DiBernardino met separately with the sanitation workers, then returned to his office. One week later, on May 19, DiBernardino held a second meeting with the maintenance employees during which he announced a new wage scale that would result in higher wages for the workers.

After the second meeting with senior management, Scott Ruhl, one of the maintenance employees, telephoned Ruppert to cancel a meeting between the workers and the union agent that had been scheduled for May 30. Ruhl said that management had addressed the maintenance employees' concerns, and they no longer needed a union. Over the next several weeks, Ruppert attempted to contact various maintenance employees, but they all told him that they no longer were interested in the union.

On June 22, 1992, IAM filed charges with the Board, alleging ULPs by Skyline. Following the issuance of a complaint and a hearing, an Administrative Law Judge ("ALJ") found that

> [i]t is true that [Skyline] decided to exempt hourly paid employees from the wage freeze before the Union entered the scene. The problem is not with the substance of that decision, but with the timing and circumstances attending its announcement. If [Skyline's] officials had the employees' interests uppermost in mind, and were eager to let them know the freeze was over, a memo distributed to those affected soon after the executive committee met in April would have sufficed.... The evidence ... leads to the inference that [Skyline] ignored the maintenance employees' complaints about their pay rates until they turned to the Union to represent them. Only then did [Skyline] respond unlawfully

by promising and delivering an enticing new wage progression plan.

*Skyline Distributors* at 7 (citation omitted), *reprinted in* App. 38. The ALJ also found that Skyline had committed ULPs in addressing the employees' complaints about vacation scheduling policy and shift transfers. *Id.* The Board adopted the ALJ's findings and issued a *Gissel*-style bargaining order. *See id.* at 1, 11, *reprinted in* App. 32, 42. Skyline now petitions for review in this court, contending that substantial evidence in the record does not support the Board's findings that the maintenance workers constituted an appropriate bargaining unit, that Skyline's labor practices did not amount to unfair labor practices, and that, even if Skyline did commit certain ULPs, the employer's conduct did not warrant the issuance of a bargaining order, as traditional remedies could adequately address the effect of Skyline's ULPs on the employees' right to determine whether they are for or against unionization.

## II. ANALYSIS

### A. *Appropriate Bargaining Unit*

█ The first issue that we face is whether the maintenance employees at the Skyline warehouse constitute an appropriate unit bargaining under the NLRA. As we noted in *Bentson Contracting Co. v. NLRB,* 941 F.2d 1262 (D.C.Cir.1991):

> In designating an appropriate bargaining unit, the Board performs the function assigned to it by section 9(b) of the Act. The Board has wide discretion in these matters and reviewing courts must generally defer to its judgment that a particular unit is appropriate. *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975); *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 171–72, 30 L.Ed.2d 341, 92 S.Ct. 383, 393–94 (1971). The central test is whether the workers share a "community of interest," that is, " 'substantial mutual interests in wages, hours, and other conditions of employment.' " *Allied Chemical & Alkali Workers,* 404 U.S. at 172, 92 S.Ct. at 394 (citation omitted); *see also Food Store Employees Union v. NLRB,* 422 F.2d 685 (D.C.Cir.1969). The

Board considers several factors, but "there are no per se rules" to resolve unit determinations: "we examine the community of interest of the particular employees involved, considering their skills, duties, and working conditions, the Employer's organization and supervision, and bargaining history, if any, but no one factor has controlling weight." *Airco, Inc.,* 273 N.L.R.B. 348 [1984 WL 37044] (1984).

*Id.* at 1265 (footnote omitted).

■ In the instant case, in finding that the maintenance workers shared a community of interest, the Board properly considered the maintenance workers' wage scale, career path, job functions, and skill level. The employees worked together in a single location under common supervision, followed a career path that was separate from other employees (even from the sanitation workers), and performed job functions requiring special skills not required of other workers. Given these facts, the Board clearly did not abuse its "wide discretion," nor did it otherwise err, in finding a unit of maintenance employees to be appropriate for bargaining. In reviewing a Board decision on unit determination, the question for the court is not whether the Board selected the *most* appropriate bargaining unit, but, rather, whether the Board chose *an* appropriate bargaining unit. *See Local 1325 v. NLRB,* 414 F.2d 1194, 1202 (D.C.Cir.1969). In this case, the record amply supports the Board's finding that the maintenance employees constituted *an* appropriate bargaining unit.

B. *The Employer's Unlawful Granting of Benefits*

■ The second issue before us concerns the Board's finding that Skyline violated section 8(a)(1) of the Act by unilaterally granting wage increases, instituting a new wage scale, and otherwise addressing worker grievances to discourage the maintenance employees from union activities. In *NLRB v. Exchange Parts Co.,* 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964), in considering the legality of economic benefits given in response to a union campaign, the Court held:

The danger inherent in well-timed increases in benefits is the suggestion of a fist

inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged.... [T]he absence of conditions or threats pertaining to the particular benefits conferred would be of controlling significance only if it could be presumed that no question of additional benefits or renegotiation of existing benefits would arise in the future; and, of course, no such presumption is tenable.

*Id.* at 409–10, 84 S.Ct. at 460 (footnote omitted). In the instant case, the ALJ, with the Board's affirmance, found that, although Skyline's decision to lift the wage freeze was lawful because it occurred before the advent of the union campaign, the employer's subsequent decisions to institute a restructured wage scale and grant an increase to maintenance employees were purposely timed to "impress [the workers] with their employer's largesse." *Skyline Distributors* at 8, *reprinted in* App. 39. She further found that DiBernardino lied in claiming that the grant of benefits had not been timed to affect the maintenance employees' choice for or against unionization. *See id.* at 7, *reprinted in* App. 38. According to the ALJ, "[b]y engaging in this conduct, which succeeded in wooing the employees away from supporting the Union, [Skyline] violated Section 8(a)(1) of the Act." *Id.* at 8, *reprinted in* App. 39. Because there is substantial evidence to support the factual inferences drawn by the ALJ, and because the legal foundation for the finding of an ULP is supported by the Court's decision in *Exchange Parts,* we cannot disturb the Board's judgment on this point.

Although the Board's finding of an ULP must be sustained, it cannot be gainsaid that this finding stands on a shaky foundation. The ALJ found that Skyline officials made the decision to lift the wage freeze before there was any indication that the maintenance employees were considering a union. In other words, the decision to lift the freeze was not designed to influence any workers against joining a union. The problem, according to the ALJ, arose when company officials decided to announce the lifting of the

freeze and the accompanying wage increase shortly after learning about the employees' interest in the union. What should the employer have done to avoid this situation? The ALJ thought that the solution was easy: "If [Skyline's] officials had the employees' interests uppermost in mind, and were eager to let them know that the freeze was over, a memo distributed to those affected *soon after the executive committee met in April* would have sufficed." *Skyline Distributors* at 7 (emphasis added), *reprinted in* App. 38. But why? There was nothing unlawful about the employer taking a small amount of time between the occasion of the executive committee meeting and the announcement to employees. Obviously, Skyline's officials did not delay to affect a union campaign, because there was no union campaign at the time when the freeze was lifted. And it is difficult to understand the ALJ's suggestion that the employer was somehow uncaring about the employees' grievances in light of her finding that the executive committee had acted promptly to cure "increasing discontent" among the employees. *Id.* at 3–4, *reprinted in* App. 34–35.

In any event, what was the employer to do once it learned of the union, having already decided to lift the wage freeze? Should the employer have kept the decision a secret, lest it be accused of unlawfully influencing employee sentiments? If so, for how long? Or should management have merely announced the lifting of the freeze, but declined to take any action that might result in a wage increase for the employees? But this could have been viewed as a threat by the employees, who could have reasonably assumed that no wage increase would be forthcoming absent an abandonment of the union campaign. Or the employer could have done what it did

here—announce the *prior* decision to lift the wage freeze and explain how it would be implemented, knowing full well that the employees could take the money and still vote for a union. When the case is considered in this light, Skyline's argument that the Board is too glib in suggesting that there is a viable distinction between the decision to lift the wage freeze and the *timing* of its announcement and accompanying wage increase has real force.

There are many ironies here. *Exchange Parts* suggests that employees like those at Skyline are threatened by "a fist inside the velvet glove" upon receiving benefits that they demand. This is a counterintuitive notion. In support of its principal premise, *Exchange Parts* says that employees never "miss the inference that the source of benefits ... conferred is also the source from which future benefits must flow and which may dry up if it is not obliged." 375 U.S. at 409, 84 S.Ct. at 460.[1] Some scholars have effectively responded, "So what?" This skeptical reaction to *Exchange Parts* is better understood if one thinks hard about the situation in this case. In reality, the maintenance employees at Skyline were playing an age-old game, attempting *to threaten management* with a union to induce the grant of benefits. Their threat succeeded, because the employees got exactly what they wanted, with no acts of reprisal or other adverse actions taken against them. The employees played their cards well: they knew that, even after getting their wage increase and other benefits, they still could have demanded a representation election and voted for a union; and they knew that if the employer was foolish enough to withdraw the grant of benefits, the union could have been recalled. This hardly looks like a situation in which

---

1. In *Exchange Parts,* the Supreme Court also supports its principal premise with the following argument:

   The beneficence of an employer is likely to be ephemeral if prompted by a threat of unionization which is subsequently removed. Insulating the right of collective organization from calculated good will of this sort deprives employees of little that has lasting value.

   375 U.S. at 410, 84 S.Ct. at 460. However, the Court appears to overstate the danger to employees of an employer tightening benefits after having, in the past, granted benefits in the face of the union campaign. First, union organizers can explain to the workers that the union is necessary to ensure that the employer will not revoke newly gained benefits; and, second, the employees are not foreclosed from restarting a union campaign and insisting on a representation election if the employer later limits or withdraws benefits. *See* Derek C. Bok, *The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act,* 78 Harv. L. Rev. 38, 114–15 (1964).

employees were intimidated by the figurative "fist inside the velvet glove."

Not only is the premise of *Exchange Parts* counterintuitive, it has been challenged by preeminent labor law scholars, who question whether certain ULPs do in fact adversely affect free and uncoerced choice by workers. For example, in his brilliant article on NLRB elections, Derek Bok argues:

> It is hard to accept [the] words [of *Exchange Parts*] at their face value. Surely the employees do not need a wage increase or an extra holiday to inform them that there is a fist within the velvet glove or that the employer who gives may also take away. These lessons have already been learned in many more obvious ways in the ordinary course of employment. And if any employees remain in doubt on this score, the union will certainly have made the matter clear in trying to persuade them that they need the protection of a union. What the Court must have in mind, therefore, is that the granting of benefits necessarily conveys a threat that the employer will exact retribution if the employees vote for the union.
>
> As a matter of ordinary experience, this conclusion seems hard to sustain. Wage increases on the eve of an election do not normally suggest retribution, nor are they given with this intent. The employer's motive is much less devious. In granting benefits, he is simply attempting to win favor among the employees and to persuade them that they will receive satisfactory wages and conditions without the assistance of the union. This is the result that the organizer fears. And it is unfortunate that the employer's conduct was not interpreted in this light, for the issues posed go to the heart of the concept of a "free" or "rational" choice under the statute.

Derek C. Bok, *The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act*, 78 HARV. L. REV. 38, 113 (1964); *see also* ROBERT A. GORMAN, BASIC TEXT ON LABOR LAW: UNIONIZATION AND COLLECTIVE BARGAINING 164 (1976) ("Although the promise by an employer to grant some special benefit in the event the union is defeated ... has coercive implications, it is not at all clear that the same is true when the employer actually grants benefits during the course of an election campaign, without any conditions and without any suggestion that those benefits will be withdrawn if the union prevails.").

Likewise, in *Union Representation Elections: Law and Reality,* the seminal empirical study on voting behavior of employees in NLRB elections, the authors found the following:

> It was not possible to test the Supreme Court's [*Exchange Parts*] theory directly, since most elections in which unlawful benefits were found also included unlawful threats or acts of reprisal. However, any straightforward explanation of the data indicates that the Court's theory is in error. A Board finding that a threat or act of reprisal had occurred was not associated with greater employee perception of threats or acts of reprisal. Moreover, there was no greater perception of reprisals in elections in which benefits occurred together with reprisals than in elections in which no unlawful campaigning was found. The promise or grant of benefits, even in conjunction with reprisals, does not increase the perception of reprisals. There is thus no reason to suppose that a promise or grant of benefits standing alone would lead employees to infer a threat of reprisal if they chose union representation.

JULIUS G. GETMAN, STEPHEN B. GOLDBERG & JEANNE B. HERMAN, UNION REPRESENTATION ELECTIONS: LAW AND REALITY 119 (1976).

When all is said and done, however, the rule of *Exchange Parts* remains the law. And we are obliged to enforce this construction of section 8(a)(1) unless and until it is revisited by the Board or the Supreme Court. In this case, there is hardly any doubt that the employer acted in part in response to a union campaign in granting benefits to the maintenance employees. Although this conduct may not have constituted a grave violation of the Act, *Exchange Parts* makes it clear that the conduct was forbidden.

## C. The *Gissel* Bargaining Order

In light of the foregoing conclusion that the ULPs in this case were far from serious, it almost goes without saying that the Board had no basis upon which to issue a *Gissel* bargaining order. As noted at the outset of this opinion, under *Gissel*, absent "outrageous and pervasive ULPs," the Board may issue a bargaining order only if it is found that an employer's ULPs had a tendency to undermine the union's majority status and impede the election process, *and* the Board determines that the possibility of erasing the effects of the unlawful conduct and ensuring a fair election by the use of traditional remedies is slight and would be better protected by a bargaining order. *See Avecor, Inc. v. NLRB*, 931 F.2d 924, 934 (D.C.Cir.1991). The Board has not come close to satisfying this standard, for there are no comprehensible findings by the Board that the granting of benefits somehow impeded the election process or that a fair election could not have been ensured by the use of traditional remedies. Indeed, the Board's decision to issue a bargaining order in this case is so lacking in evidentiary support and reasoned decision-making that it seems whimsical.

In addressing the question of whether an employer's grant of economic inducements, without more, can support the issuance of a *Gissel* bargaining order, the Board faces several hurdles. The first is the well-established legal requirement that any *Gissel* order must be fully justified. "[A] bargaining order is not a snake-oil cure for whatever ails the workplace; it is an 'extreme remedy' that must be applied with commensurate care." *Avecor*, 931 F.2d at 938–39 (citation omitted). In *Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35 (D.C.Cir.1980), we said that

> before we will enforce a bargaining order, we must be able to determine from the Board's opinion (1) that it gave due consideration to the employees' section 7 rights, which are, after all, one of the fundamental purposes of the Act, (2) why it concluded that other purposes must override the rights of the employees to choose their bargaining representatives and (3) why other remedies, less destructive to employees' rights, are not adequate.

*Id.* at 46. The Board continues to ignore these admonitions and, thus, has faced a string of reversals in this circuit. *See, e.g., Somerset Welding & Steel, Inc. v. NLRB*, 987 F.2d 777 (D.C.Cir.1993); *Caterair Int'l v. NLRB*, 22 F.3d 1114 (D.C.Cir.1994); *Charlotte Amphitheater Corp. v. NLRB*, 82 F.3d 1074 (D.C.Cir.1996). This litigation presents yet another instance in which the Board has failed to justify a bargaining order on the terms required by *Peoples Gas* and *Avecor*.

This case, however, involves much more than a simple failure by the Board to explain its proposed remedy. During oral argument, Board counsel acknowledged that there is almost no judicial authority supporting a *Gissel* bargaining order based solely on the grant of economic inducements. In our research, we could uncover only one such case, *Texaco, Inc. v. NLRB*, 436 F.2d 520 (7th Cir.1971), and Board counsel could cite us to no others. *Texaco* is of little moment, because, in a subsequent decision by the Seventh Circuit, *NLRB v. Gruber's Super Market, Inc.*, 501 F.2d 697 (7th Cir.1974), the court reached a different conclusion, finding that an economic benefit conferred by an employer on its employees did not by itself support a bargaining order. *Id.* at 705–06. In all other cases that we have found involving economic inducements in which a circuit court has enforced a *Gissel*-style bargaining order, the employer's ULPs combine an economic inducement with negative acts of reprisal. *See, e.g., St. Francis Fed'n of Nurses & Health Prof'ls v. NLRB*, 729 F.2d 844, 855 (D.C.Cir.1984) ("The Board placed particular emphasis on the unlawful wage increase because it affected all employees, but it also relied upon the whole litany of unfair labor practices that characterized the Hospital's anti-Union campaign—interrogations, threats, and promises of benefits.").

Although it is undoubtedly difficult to state a firm list of requirements that must be met in order to support a *Gissel* bargaining order, it is not difficult to fathom that those requirements typically have involved more than just the grant of economic benefits. One authority has attempted to summarize the case law on this point, as follows:

Some principles can ... be deduced from the Board's opinions. First, an unfair labor practice that is viewed as "deliberate" or "calculated" is more likely to lead to a bargaining order than one that is not. Second, much turns on the significance of the interest being endangered. If the employer's statements or acts can be characterized as threatening either a significant economic interest, such as retention of jobs, or a fundamental legal right, it. is more likely to lead to a bargaining order. Third, acts of reprisal, particularly discharges, are considered to be extremely effective in swaying votes and very difficult to remedy. Not only is there a great deal of language to this effect in Board opinions, but also the coincidence of section 8(a)(3) violations and bargaining orders is notable. Fourth, promises to correct the grievance that led to union organization are also considered particularly effective. Finally, and most significantly, the vast majority of bargaining order cases involve a series of unfair labor practices rather than a single act of illegality.

JULIUS G. GETMAN & BRETRAND B. POGREBIN, LABOR RELATIONS: THE BASIC PROCESSES, LAW AND PRACTICE 76 (1988) (footnotes omitted).[2] Our view of the case law is consistent with this summary. This being so, the Board cannot simply abandon this long line of contrary authority with no· explanation. If the Board in future cases believes that a bargaining order should issue in a case involving nothing more than the grant of economic benefits, then it must explain why it is necessary and it must also distinguish the case law that appears to militate against such a remedy.

Finally, and most importantly, the Board's bargaining order cannot be enforced in this case because the Board has given no credence whatsoever to employee "free choice." One of the principal protections of the NLRA is the right of employees to bargain collectively through representatives of their own choosing *or* to refrain from such activity. *See International Ladies' Garment Workers' Union v. NLRB,* 366 U.S. 731, 737, 81 S.Ct. 1603, 1607, 6 L.Ed.2d 762 (1961). This is an inviolate right under the NLRA, one that the Court in *Gissel* did not mean to undermine. *See Gissel,* 395 U.S. at 614, 89 S.Ct. at 1940 ("effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior"). In other words, "[t]he Court thus anchored its holding in *Gissel* to the NLRA's core principle that a majority of employees should be free to accept or reject union representation." *Conair Corp. v. NLRB,* 721 F.2d 1355, 1380–81 (D.C.Cir.1983).

The courts have been strict in requiring the Board to justify *Gissel* bargaining orders, in part, because employees lose the *final say* over whether to endorse or reject unionization with the issuance of a bargaining order. Since this final choice is a· core right under the NLRA, a *Gissel* bargaining order is necessarily seen to be an "extreme remedy," *Avecor,* 931 F.2d at 939, which is justified only in "exceptional circumstances." *Charlotte Amphitheater,* 82 F.3d at 1080.

It is hard to see how the issuance of a *Gissel* bargaining order based *solely* on the grant of economic benefits can be squared with principles of employee "free choice." Derek Bok's article convincingly asserts that:

the choice protected by the NLRA is one which permits the employees to determine whether their own best interests will be better served with or without a union. In making this decision, the employee will pay little heed to whether favorable conditions are maintained by the employer to· keep out the union or for some independent business purpose, for he will benefit equally in either case. Indeed, countless employees have profited from wage increases and improvements which are regularly granted by employers to diminish the threat of some future organizational drive. No one has attempted to prevent employ-

---

**2.** It is noteworthy that an application of these factors to the instant case plainly militates against the issuance of a *Gissel* bargaining order. The ULPs certainly were not "calculated" in the normal sense, because the decision to lift the wage freeze predated the advent of the union.

The employer did not threaten any significant employee interests. There were no acts of reprisal. The economic benefits were granted, not merely "promised." And, finally, Skyline did not commit a "series of unfair labor practices."

ers from pursuing this policy, and one can even argue that it is consistent with the purposes expressed in section I of the act. In terms of free choice, therefore, the problem with benefits granted during an organizational campaign is not that they are designed to defeat the union.

Derek C. Bok, *The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act*, 78 HARV. L. REV. 38, 113–14 (footnote omitted). The Board never addresses this question, and it is one among many that must be faced if the Board seeks in the future to replicate the action taken in this case.

At bottom, we find no basis for the *Gissel* bargaining order in the record before us. Although we reverse the decision of the Board, we do not mean to adopt any *per se* rule. The Board will be free to grapple with the question of the appropriateness of a *Gissel* bargaining order based solely on the grant of economic benefits as it sees fit in the future. In this case, however, there is no showing either that Skyline's grant of benefits somehow impeded the election process or that a fair election could not have been ensured by the use of traditional remedies.

## III. CONCLUSION

The Board's cross-petition for enforcement is granted in part as to the unit determination and the finding of ULPs. Skyline's petition for review is granted in part as to the challenge to the *Gissel* bargaining order. The case is hereby remanded to the Board for the determination of a new remedy, excluding the *Gissel* bargaining order.

KAREN LeCRAFT HENDERSON, Circuit Judge, concurring:

While I concur in the judgment, I write separately to make three points. First, this court has "repeatedly instructed the Board to determine the appropriateness of a *Gissel* bargaining order in light of the circumstances existing at the time it is entered" to take account of, *inter alia*, the passage of time, employee turnover and sensitized management. *Charlotte Amphitheater Corp. v. NLRB*, 82 F.3d 1074, 1078 (D.C.Cir.1996); *see also Avecor, Inc. v. NLRB*, 931 F.2d 924,

936–37 (D.C.Cir.1991), *cert. denied*, 502 U.S. 1048, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992); *Amazing Stores v. NLRB*, 887 F.2d 328, 331 (D.C.Cir.1989), *cert. denied*, 494 U.S. 1029, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990); *Pedro's, Inc. v. NLRB*, 652 F.2d 1005, 1012 (D.C.Cir.1981); *Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 45–46 n. 18 (D.C.Cir. 1980). Our sister circuits have likewise insisted that factors such as the passage of time and employee turnover are relevant considerations in reviewing a *Gissel* bargaining order. *See, e.g., NLRB v. Cell Agric. Mfg. Co.*, 41 F.3d 389, 398 (8th Cir.1994) (passage of time, employee turnover and management's voluntary statements of cooperation); *NLRB v. So–Lo Foods*, 985 F.2d 123, 128–29 (4th Cir.1992) (employee turnover); *NLRB v. LaVerdiere's Enters.*, 933 F.2d 1045, 1054–55 (1st Cir.1991) (passage of time); *Texas Petrochemicals Corp. v. NLRB*, 923 F.2d 398, 405–06 (5th Cir.1991) (passage of time); *M.P.C. Plating, Inc. v. NLRB*, 912 F.2d 883, 888 (6th Cir.1990) (passage of time and employee turnover); *Impact Indus. v. NLRB*, 847 F.2d 379, 383 (7th Cir.1988) (passage of time, employee turnover and change of management); *Piggly Wiggly v. NLRB*, 705 F.2d 1537, 1543 n. 9 (11th Cir.1983) (changes up to time of hearing). Yet the Board continues to flout this unambiguous precedent by, as here, reciting that "the propriety of a bargaining order depends on the circumstances existing at the time the unfair labor practices were committed and is not affected by subsequent events." App. A–32. We would not tolerate this kind of intransigence on the part of other litigants and I do not understand why the Board should receive special treatment.

My second point is related in that it comes from a concern with the breaches of professionalism displayed by the ALJ in this case. Her order is peppered with sarcasm (*e.g.*, Ruhl "apparently forgot," App. A–34; Ruhl had a "low tolerance for pests," App. A–36; sanitation work "entailed little more than changing sponges in squeegee mops," App. A–37; "other than being certain that none of the sanitation employees could perform his job, [Ruhl] was unable to describe what they did do," App. A–37) and uncalled for asides (*e.g.*, DiBernardino, "[t]rue to his word," App.

A–36; Sullivan and Ruhl, "in spite of themselves," App. A–36 and A–39; Sullivan and Ruhl, "try as they might," App. A–39; Ruhl "could not retain that pose when he spoke with pride," App. A–39; Krystyniak, "[t]rying to oblige his Employer," App. A–39), which seriously call into question her impartiality. I do not know whether this is an isolated lapse but the Board's cavalier attitude toward precedent cannot help but set a bad example.

Finally, I fail to see that the Supreme Court, in its eight-paragraph opinion in *Exchange Parts,* had more than one "premise" or made more than one "argument." *Cf.* Maj. Op. at 408 n.1. The Court's concern was with an employer who grants employee benefits with the purpose of affecting the outcome of a representation election. Whether describing this purpose as "calculated" good will, *NLRB v. Exchange Parts Co.,* 375 U.S. 405, 410, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964), "ephemeral" beneficence, *id.,* or conduct "immediately favorable to employees," *id.* at 409, 84 S.Ct. at 460, and without distinguishing between short-term and long-term employee gains, the Court simply concluded that an unfair labor practice can arise, in the Court's language, from the "conferral of [economic] benefits, without more, where the employer's purpose is to affect the outcome of the election," *id.* at 406, 84 S.Ct. at 458.