**GARVEY MARINE, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**International Longshoremen's Association, Local 2038, Intervenor.**

**No. 00–1076.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 6, 2000.

Decided April 17, 2001.

Kenneth R. Dolin argued the cause for petitioner. With him on the briefs was Scott V. Rozmus.

Julie B. Broido, Supervisory Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were Leonard R. Page, General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel. Charles P. Donnelly, Supervisory Attorney, entered an appearance.

James B. Coppess argued the cause for intervenor. With him on the brief was Craig Becker.

Before: GINSBURG, RANDOLPH and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Opinion concurring in part and dissenting in part filed by Circuit Judge RANDOLPH.

GINSBURG, Circuit Judge:

The International Longshoreman's Association, Local 2038, AFL–CIO sought to represent deckhands on one of several fleets of boats belonging to Garvey Marine, Inc., a company that provides towing and related services. The Union, after losing a representation election, filed a complaint with the National Labor Relations Board alleging that Garvey had engaged in numerous unfair labor practices (ULPs), in violation of §§ 8(a)(1), (3), and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3) & (5). The Board held that Garvey had committed most of the alleged ULPs, and ordered the Company not only to take various steps to remedy those violations but also to bargain with the Union. *See Garvey Marine, Inc. et al.,* 328 NLRB No. 147, slip op. at 7–8, 1999 WL 562095 (1999) (hereinafter *Decision*).

Garvey petitions for review of the Board's order, the Board cross-applies for enforcement of its order, and the Union intervenes on behalf of the Board. Because the agency's findings are supported by substantial evidence and its order is reasonable, we deny Garvey's petition and grant the Board's application for enforcement.

## I.  Background

Garvey provides "barge towing, fleeting, switching and related harbor services for barge companies and a variety of other commercial entities" from docks in five Illinois towns. *Decision* at 12. This appeal involves only Garvey's facility in Lemont, Illinois, which is managed by its vice president, Todd Hudson. Each Garvey boat is staffed by a crew of deckhands supervised by two or more pilots, one of whom serves as captain. A dispatcher, with two assistants, oversees the move-

ment of the boats and assigns pilots and deckhands to crews.

In early 1995 the Union filed with the Board a petition to represent the Lemont deckhands and pilots. After Garvey presented evidence that the pilots were supervisors, the Union agreed to exclude them from the bargaining unit. A representation election was held in March, and the Union lost by a narrow margin. *Id.* at 10.

The Union then filed an unfair labor practice charge against Garvey alleging that Garvey's agents had made numerous illegal threats, promises, and predictions during the election campaign; illegally implemented a new disciplinary system in order to discourage union support; and warned and dismissed employees for supporting the Union. *See* 29 U.S.C. §§ 158(a)(1), (3). The Union asked the Board to issue a so-called *Gissel* order directing Garvey to bargain with the Union notwithstanding the Union's having lost the election. *See NLRB v. Gissel Packing Co., Inc.,* 395 U.S. 575, 614, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) (holding that Board may order employer to bargain with union that once had majority support if "the possibility of erasing the effects of past practices and of ensuring a fair [new] election ... by the use of traditional remedies ... is slight").

After a hearing, an Administrative Law Judge held that Garvey had committed many, though not all, of the alleged ULPs. The ALJ held that pilots, whom he determined to be "supervisors" under the Act, *Decision* at 27, had made a large number of "patently coercive" promises and threats to prounion employees. *Id.* at 28. Weighing the credibility of sometimes conflicting testimony, the ALJ found that several pilots had told deckhands that if the Union lost the election then the deckhands would get raises, overtime pay, and improved insurance benefits, but if the Union

won then Garvey would refuse to negotiate with it, there would be wage reductions and a strike, employees would be required to pay for their equipment, and Garvey might close the Lemont facility. The ALJ also credited the testimony of some deckhands that pilots had implied there would be reprisals against pro-union deckhands, one of whom was threatened with a "shipboard accident." *Id.* at 19–22.

The ALJ found further that during the election campaign Garvey had substituted a formal, written, and progressive system of disciplinary sanctions for its earlier "loose, subjective, erratic practice of selective verbal warnings." Finding that the change had been made "solely in reaction to the filing of a representation petition," the ALJ held that institution of the new policy was an ULP. *Id.* at 29.

Finally, the ALJ determined that Garvey had illegally dismissed two deckhands, Karl Senff and Steven Bradley, because of their union activities. That Senff and Bradley actively supported the Union is undisputed. Senff was dismissed in April 1995 after having been given repeated warnings—which he openly and purposely flouted—not to be late for his shifts. Bradley was dismissed in May when, having received a job assignment that he viewed as dangerous, he threatened to damage Company property and to fake a workplace accident. Despite these two employees' admittedly serious misconduct, the ALJ held their dismissals were unlawful. He offered several reasons, notably Garvey's history of less harshly disciplining employees guilty of similar and more serious infractions, warnings pilots had given Senff that his union advocacy made him a target, and the dispatcher's statement to Bradley that he was suspended because of his union activity. *Id.* at 30.

The ALJ denied the Union's request for a bargaining order. He held that tradi-

tional remedies—ordering Garvey to avoid future infractions, to retract its new disciplinary code and the warnings issued thereunder, and to offer backpay and reinstatement to Bradley and Senff—would be sufficient to ensure a free and fair rerun election. Although he did not think a bargaining order was warranted, neither did the ALJ accept the Company's argument that he should consider turnover in Garvey's management. *Id.* at 31. The ALJ did observe, however, that Garvey's most egregious violations were all committed by pilots—Garvey's lowest level of supervisors—and that, of the deckhands who were illegally threatened or dismissed, most had themselves engaged in significant misconduct. He also emphasized that most of the pilots' threats and promises had been made to only a handful of pro-union deckhands who, by all accounts, continued nonetheless to advocate election of the Union. *Id.* at 31–32.

A three-member panel of the Board unanimously affirmed the ALJ's determinations regarding Garvey's ULPs. The majority went on to issue a bargaining order in light of what it called Garvey's "egregious[ ]" pattern of violations. *Id.* at 3. The majority pointed out that the ALJ had found more than 30 violations, among them threats of physical violence, and that Garvey had persisted in violating the Act even after the election was held. *See id.* at 4. That the threats had been made by pilots, who were the deckhands' immediate supervisors, seemed to the majority to create "precisely the legacy of coercion that endures in the workplace and that the Supreme Court addressed in *Gissel.*" *Id.* at 5. Member Hurtgen dissented with respect to the bargaining order for essentially the reasons stated by the ALJ and because he regarded turnover as "a relevant factor in determining whether a fair election can be held." *Id.* at 9.

Garvey moved to reopen the record in order to introduce additional evidence of turnover among its employees and managers, and asked the Board to reconsider its orders on the basis of this evidence. The Board denied the motion, Member Hurtgen again dissenting, and Garvey petitioned this court for review of the Board's orders.

## II. Analysis

With regard to the ULP charges, Garvey argues that because it had expressly instructed its pilots not to make threats or promises during the representation election campaign, the Board erred in attributing to management such statements as were made, and that the dismissals of Senff and Bradley were based entirely upon their own misconduct and not at all upon their union activity. With regard to the remedy, Garvey maintains that the Board should not have issued a bargaining order because any ULPs it committed were not so "extensive[ ]" and "pervasive" as to make "slight" "the possibility of erasing the[ir] effects" by means of a new representation election. *Gissel,* 395 U.S. at 614, 89 S.Ct. 1918.

### A. *Pilots as Agents of Management*

▋ According to Garvey, the deckhands could not reasonably have believed that the pilots who made promises and threats to union adherents were acting on the Company's behalf. Garvey points out that its vice president, Hudson, made repeated written and oral statements disclaiming any promises or threats and assuring deckhands there would be no reprisals taken for their union activity. Garvey also notes that it conducted formal training for its pilots during which it specifically forbade them to issue threats or promises. In view of all this, Garvey says, the deckhands surely would have

discounted any offending statement made by an errant pilot.

The Board took the opposite position, to which we must defer if it is supported by substantial evidence:

> [T]he Board's determination of whether a particular actor is properly considered an agent or was acting with apparent authority is granted only limited deference .... However, the standard of review is not *de novo* .... [T]he existence of an agency relationship is a factual matter ... which cannot be disturbed if supported by "substantial evidence on the record considered as a whole."

*Overnite Transp. Co. v. NLRB,* 140 F.3d 259, 265 (D.C.Cir.1998). The Board's determination finds such support. Garvey required its pilots to sign a policy that they would support the Company in the Union campaign—and the deckhands knew it. *Decision* at 13, 27–28. A reasonable deckhand, therefore, would not necessarily have assumed that a pilot's statement in contravention of Garvey's official policies was unauthorized; he would as likely have concluded that Garvey's public statements were primarily for show while the pilot's private warnings reflected management's actual position. Similarly, the Board could reasonably determine that the close working relationship between the pilots and the deckhands they supervised enhanced rather than undermined the credibility of the pilots' statements. Because the Board's determination that Garvey's pilots were, and were viewed as, the Company's agents is based upon substantial evidence, those findings merit our deference.

### B. *The Dismissals of Senff and Bradley*

Garvey suspended and then dismissed Senff and Bradley pursuant to its newly adopted disciplinary code. *See* Part I above at 3. It is unclear, however, whether the Board believes (as suggested in its order) that the dismissals of Senff and Bradley were perforce illegal because they were made "pursuant to the ... unlawfully implemented progressive disciplinary system," *see Decision* at 2, or (as the Board suggests in its brief) merely that the unlawfulness of the policy "strongly support[s]" a further finding that the dismissals were themselves ULPs. Because the former claim is doubtful, *see Performance Friction Corp. v. NLRB,* 117 F.3d 763, 768 (4th Cir.1997), we follow the General Counsel in attributing the latter view to the Board.

For the Board to hold that the dismissals of Senff and Bradley were unfair labor practices, the General Counsel must first have made out a prima facie case that their union activities were "a substantial or motivating factor" in their dismissals. *Wright Line,* 251 NLRB 1083, 1087, 1980 WL 12312 (1980), *approved by NLRB v. Transportation Mgmt. Corp.,* 462 U.S. 393, 401, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), *overruled in other respects, Director, Office of Workers' Compensation Programs v. Greenwich Collieries,* 512 U.S. 267, 278, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994). The burden then shifts to Garvey to show that it would have dismissed the two "regardless of [its] forbidden motivation." *Id.* In our view the Board correctly determined that the General Counsel made out a prima facie case regarding both Senff and Bradley, and that Garvey failed to rebut either one.

#### 1. *Dismissal of Senff*

Garvey contends that it dismissed Senff only because of his repeated and deliberate lateness and not because of his activity on behalf of the Union. Not only was Senff consistently and habitually tardy, he informed supervisors that he felt "entitled" to come in late whenever he had

been relieved late at the end of his previous shift. *Decision* at 23. On several occasions boats were delayed beyond their scheduled departure times waiting for Senff; sometimes they left without him. After ignoring numerous warnings Senff was discharged for tardiness some time in 1994. He was later rehired, however, in "late 1994 or early 1995." *Id.*

Although the Board found Senff's intentional and repeated tardiness "provocative misconduct" worthy of discipline, it nevertheless held that his second dismissal, in April 1995, was due not to his lateness but to his activity on behalf of the Union. *Id.* at 2, 30. The Board based that conclusion upon several facts: Garvey was aware of Senff's union activities; it repeatedly threatened advocates of the Union, and Senff in particular, with discharge; it dismissed Senff for the second and final time only a short while after the union election; and it had had a "tradition of leniency prior to the organizing effort" that contrasted sharply with "the progressive written [disciplinary] system unlawfully imposed during the campaign." *Id.* at 2.

Garvey's awareness of Senff's union activities and the timing of his dismissal are circumstantial evidence that his dismissal was motivated by impermissible animus. *See, e.g., Power Inc. v. NLRB,* 40 F.3d 409, 418 (D.C.Cir.1994) ("[B]oth direct and circumstantial evidence" of such factors may be used to establish employer's unlawful motive). The prima facie case is clearly established, however, by the other factors upon which the Board relied: Garvey had rehired Senff before the union campaign notwithstanding his record of tardiness, and Garvey's agents had threatened Senff's job on several occasions expressly because of his union sympathies.

Garvey objects to the Board's reliance upon the ALJ's having credited Senff's testimony that several pilots had repeatedly threatened his job even as the ALJ rejected other portions of Senff's testimony as incredible. *Compare Decision* at 20, 21 (crediting Senff's testimony as to threats), *with id.* at 25 (rejecting Senff's testimony as to his own tardiness). The trier of fact is surely entitled, however, to credit some but not all of a witness's testimony, particularly when he must resolve conflicts among witnesses none of whom seems entirely reliable.

The General Counsel having made his prima facie case, the burden shifted to Garvey to show that it would have dismissed Senff even had he not favored the Union. The Board reasonably held that Garvey did not carry that burden. *Decision* at 3. Garvey suggests that its dismissal of Senff for tardiness in 1994, before the union campaign began, demonstrates that it would have dismissed him again in 1995 regardless whether he had engaged in union activity. This argument fails to account, however, for Garvey's decision to rehire Senff after having dismissed him for tardiness the first time. Until Senff began to campaign for the Union, Garvey had apparently concluded that Senff's value as an employee outweighed the cost of keeping him, including his seemingly incorrigible tardiness. Therefore, Garvey must persuasively explain what change of circumstances—other than his union activity—induced it to change its position and again fire Senff.[*] Its conclusory protes-

---

[*] Our dissenting colleague speculates that Garvey may have fired Senff the second time because the cumulative costs of his brazen tardiness, assessed in an everchanging environment, simply became too much for Garvey to bear. Dissent at 829–31. A prima facie case that Senff was fired for his union advocacy having been made, however—a case supported not only by his 1994 dismissal but also by explicit warnings from Garvey's agents

tation that Hudson had finally "tired" of Senff's conduct is unpersuasive. *Id.* at 30.

### 2. *Dismissal of Bradley*

■ The Board's decision regarding Garvey's dismissal of Bradley parallels its decision regarding Senff, and we uphold it for similar reasons. Like Senff's tardiness, the Board deemed Bradley's threat to fake a workplace injury "provocative misconduct" for which discipline was reasonable. *Id.* at 30. The Board was nevertheless justified in concluding that Bradley's dismissal was motivated in part by his union advocacy: Garvey's dispatcher told him so. *Id.* at 3. The Board also relied upon Garvey's elaborate choreography of Bradley's initial suspension, which preceded his formal dismissal by a few days: Garvey sent Bradley's boat back to the dock midshift, where Bradley—observed by the crews of three boats that had been held at the dock, presumably so they could witness the event—was met by a sheriff's officer who escorted him off the premises. This procedure suggests that Garvey at the least wanted to make an example of Bradley; it had staged no such spectacle when, on an earlier occasion, it delayed until shift's end the dismissal of a deckhand who had threatened a pilot with a knife. *See id.* at 3, 5. Finally, the Board concurred in the ALJ's observation that there was reason to believe that Bradley, who was known to have "a tendency to rash, ill-considered remarks," was only joking and was so understood by those present. *Id.* at 3, 30.

These circumstances are adequate to make out a prima facie case that Bradley's dismissal was motivated in part by his union activity. *See, e.g., Reno Hilton Resorts v. NLRB,* 196 F.3d 1275, 1282 (D.C.Cir.1999) (upholding Board's determination that a prima facie case is made out if "there is substantial evidence supporting the [claim] that anti-union animus was a motivating factor in the employer's decision"). Garvey is correspondingly unable to demonstrate that it would have fired Bradley even if he had not engaged in such activity. On this record, the dispatcher's statement to the contrary and the little mid-shift melodrama of the suspension are insurmountable ramparts protecting the Board's position from successful attack.

### C. *The Bargaining Order*

■ The Board may order an employer to bargain with a union that has lost a representation election because of the employer's ULPs if, as here, the union at one time enjoyed majority support in the bargaining unit, *see Gissel,* 395 U.S. at 610, 89 S.Ct. 1918. Because a *Gissel* order is, however, an "extreme remedy," *Vincent Indus. Plastics, Inc. v. NLRB,* 209 F.3d 727, 738 (D.C.Cir.2000), we scrutinize with great care the Board's decision to issue one. The Board must show that the employer's ULPs were "serious," *Skyline Distrib. v. NLRB,* 99 F.3d 403, 410 (D.C.Cir.1996), and the Board must have

explicitly balance[d] three considerations: (1) the employees' § 7 rights [to a representative of their own choosing]; (2) whether other purposes of the Act

---

that Senff's job "was in jeopardy because of his union activities," *Decision* at 30—it is Garvey, and not the Board, that bears the burden of demonstrating that the scenario in the dissent is indeed what occurred. *See Transp. Mgmt.,* 462 U.S. at 401–02, 103 S.Ct. 2469. Contrary to the dissent (at 830), we do not suggest that an employer must "tolerate

misconduct so long as [a] problem employee maintains the same level of insubordination"; but an employer does not meet its burden under *Wright Line* when, after a prima facie demonstration of antiunion animus, it does no more than contend, without support, that it just couldn't take it anymore.

override the rights of employees to choose their bargaining representatives; and (3) whether alternative remedies are adequate to remedy the violations of the Act.

*Vincent,* 209 F.3d at 734. The Board must also have "determine[d] the appropriateness of a *Gissel* bargaining order in light of the circumstances existing at the time it is entered." *Flamingo Hilton–Laughlin v. NLRB,* 148 F.3d 1166, 1171 (D.C.Cir. 1998). If the Board has done all this, then the court will uphold the Board's decision provided it is reasonable. *See Traction Wholesale Ctr. Co., Inc. v. NLRB,* 216 F.3d 92, 104 (D.C.Cir.2000).

■ In this case the Board did all that we require. It conducted a detailed analysis of the proven ULPs, and reasonably concluded that the resulting "legacy of coercion" would prevent employees from freely exercising their right to choose their own representative if only the usual remedies, including a new election, were ordered. *Decision* at 5.

Garvey objects to several features of the Board's analysis. First, the Company points out that the threats cited by the Board in support of its order were made during one-on-one encounters between pilots and a relatively small number of deckhands. Moreover, those most seriously threatened—Senff, Bradley, and another—were undeterred in their union advocacy and, according to Garvey, there was no evidence that the many deckhands who were not personally threatened ever learned of the threats. Garvey also marshals the ALJ's point that the threats were less serious because they came only from pilots and were at odds with the official

statements made by Vice President Hudson.

These arguments do not show that the Board acted unreasonably. The Board acknowledged that relatively few deckhands were threatened in person, but it balanced that fact against the small size of the unit, which had only 22 voters, *see Decision* at 10; the frequency of the threats, of which there were more than 30 during the two-month union campaign; and the nature of those threats, several of which menaced union adherents with physical harm. *See id.* at 4. The Board's reasonable assumption that news of the ULPs—both the threats and the discharges—would be disseminated among the deckhands is buttressed by Garvey's very public staging of Bradley's suspension.** The Board reasonably concluded that the pattern of ULPs created a "legacy of coercion" that was likely to have been disseminated and to have poisoned the atmosphere in which any new election would take place. *Id.* at 5.

In its reply brief, Garvey argues that the Board must accept the ALJ's finding that word of the ULPs had not been disseminated among Garvey's workforce because the ALJ based his determination upon his assessment of the credibility of witnesses, whose testimony the Board could not directly evaluate. The premise of Garvey's argument is false, however; the ALJ never found, based upon testimony before him, that in fact news of the ULPs had not gotten around. Rather, he opined that the threatened employees' persistence in union activities "would certainly tend to diminish the coercion's impact" even assuming it was disseminated to deckhands on other boats. *Id.* at 31. The

---

** The suspension is relevant to the *Gissel* order although it postdated the election because the Union had by then filed its first complaint alleging that Garvey's misconduct had tainted

the election, and thereby raised the possibility that there would be a rerun election. *See Decision* at 5.

Board, by contrast, believed that Bradley's suspension alone, having been "carried out in a manner that would ensure a dramatic and lasting impression on other employees ... obviates any argument that other employees would not have been aware of the unlawful conduct and its import." *Id.* at 5. Thus, we see, the Board did not reject the ALJ's factual findings; it merely gave less weight than had the ALJ to the testimony of various deckhands who said they had not heard about the ULPs.

The Board was also reasonable in hypothesizing, contrary to the ALJ, that a "rough and ready" threat made by an immediate supervisor "may be far more credible and influential so far as the ordinary worker is concerned than a necessarily more formal, structured, and purposeful statement of a high-ranking executive," *id.* at 4 & n. 11 (quoting *Teamsters v. NLRB*, 435 F.2d 416, 417 (D.C.Cir.1970)). It would not be unreasonable to believe that a direct supervisor can coerce a line employee at least as effectively as an executive can even had that view not been explicitly endorsed by this court in the case just quoted.

Finally, Garvey contends that changes in its ownership and turnover in its workforce make a bargaining order unnecessary. Between the conclusion of the election campaign and the issuance of the order Garvey came under new ownership, all but four of the deckhands, three of the six pilots who committed ULPs, and the lead dispatcher at Lemont left the Company, and a fourth pilot left the Lemont facility. With most of both the perpetrators and the direct victims of the ULPs gone, suggests Garvey, traditional remedies should suffice to protect the current employees' § 7 rights. Garvey also notes that only a rerun election would allow its many new deckhands a chance to vote for or against the Union.

Notwithstanding the Board's assertion that it "traditionally does not consider turnover among bargaining unit employees in determining whether a bargaining order is appropriate," lest employers in violation of the Act gain an incentive to stall enforcement proceedings, *Decision* at 5, this court requires it to consider turnover "unless it finds that the employer's practices are particularly flagrant, ... pervasive, and likely to persist despite turnover." *Avecor, Inc. v. NLRB*, 931 F.2d 924, 937 (D.C.Cir.1991). That is precisely the finding that the Board made in this case:

> [W]e have not in this case refused to consider the Respondent's representations regarding turnover. Rather, we find that, even when those representations are considered, the circumstances of this case do not warrant a conclusion that a fair second election is possible.

*Decision* at 6 n.14.

As we have seen, the Board reasonably viewed Garvey's pattern of ULPs as egregious and pervasive. Such violations would likely, as the Board said (quoting *Bandag, Inc. v. NLRB*, 583 F.2d 765, 772 (5th Cir.1978)), "live on in the lore of the shop," affecting the ability of new hires and veteran employees alike to vote their true preferences in a new election. *Id.* at 6. A change in the ownership of the Company is insufficient to reverse this effect; indeed, Hudson, who was in charge of the Lemont facility when the ULPs were committed, continues in the same capacity under the new ownership. Nor can Garvey repudiate its lower-level agents on the ground that its association with the ULPs committed by its pilots dissipated with their departure. Having enlisted the pilots in aid of the Company's anti-union campaign, Garvey cannot now contend that deckhands—old or new—will understand the threats and promises that the pilots made in the course of that campaign to

have been rogue acts unrepresentative of management's position. *See* Part II.A above. For all these reasons, we hold the Board's bargaining order and its denial of Garvey's motions to reopen the record and for reconsideration are reasonable.

### III. Conclusion

The Board's factual findings in this case are supported by substantial evidence, its legal conclusions are reasonable, and its *Gissel* order meets the criteria prescribed by this court. We therefore deny Garvey's petition for review and grant the Board's application for enforcement.

*So ordered.*

RANDOLPH, Circuit Judge, *concurring in part and dissenting in part*:

I join all of the majority's opinion except the portions dealing with the termination of Karl Senff and the bargaining order. Senff kept showing up late for work. His lateness was intentional and he was unrepentant. Given this state of affairs, Garvey Marine did not commit an unfair labor practice in firing him.

Senff "admitted that from early in his employment at Lemont, he had a history of high absenteeism and tardiness for which he had been 'hollered at a lot' ... [and verbally] warned ...." *Decision* at 13–14, 23. He conceded, and two other witnesses testified, that his punctuality problem exceeded that of any other deckhand. *See id.* at 23. Senff was late for three-fifths of his shifts by an average of 20 minutes. *See id.* at 14. He brazenly claimed he was entitled to arrive late as self-compensation for working late on previous shifts. *See Decision* at 23; maj. op. at 824–25.

Senff's self-compensation program disrupted the company's operations, causing boats to delay their scheduled departure times and occasionally to leave without him. *See Decision* at 23; maj. op. at 825. He persisted in this course of conduct until the date of his discharge, despite many verbal warnings and three written warnings explicitly threatening termination.

No precedent in labor law requires a company to endure such blatant disdain for its rules. The ALJ and the Board both acknowledged that an employer could reasonably discipline an employee for such conduct—conduct the ALJ characterized as "headed for self-destruction." *See Decision* at 2, 29. The ALJ added: "Clearly, an employer, even a tolerant one, is not expected to forever suffer the provocative misconduct of employees who had once engaged in protected activities." *Decision* at 30. Nonetheless, the Board, sustained by my colleagues, found insufficient evidence that the company would have terminated Senff regardless of his union activities. *See Decision* at 2–3, 30; maj. op. at 825.

Even with its informal, "lenient" disciplinary system, Garvey Marine never countenanced the sort of conduct for which Senff was discharged. As the majority acknowledges, the company had previously terminated Senff for the same conduct. *See* maj. op. at 825. It later rehired him, possibly because it faced a shortage of deckhands. *See Decision* at 1–2. In addition, as Senff himself testified, the company had discharged other deckhands for attendance problems like his. *See Decision* at 13.

An employer, even a lenient one who prides itself on maintaining an informal workplace, is not required by the National Labor Relations Act to tolerate what is universally regarded as inappropriate workplace conduct from employees who engage in union activities. *See* 29 U.S.C. § 160(c). I agree with the Seventh Circuit that an "employer who has tolerated bad

behavior in the past is not forced to continue to do so, let alone required to tolerate *increasingly* bad behavior." *Vulcan Basement Waterproofing of Illinois, Inc. v. NLRB*, 219 F.3d 677, 689 (7th Cir.2000). Tardiness and absenteeism are objectively bad conduct: among an employee's most basic—and least difficult to satisfy—obligations is showing up for work at the appointed hour. The Board's and the majority's contrary view "rests at bottom on the apparent notion that blatant misconduct once tolerated at all must be tolerated forever. However ... there must be room in the law for a right of an employer somewhere, sometime, at some stage, to free itself of continuing, unproductive, internal, and improper [conduct]." *NLRB v. Eldorado Mfg. Corp.*, 660 F.2d 1207, 1214 (7th Cir.1981); *see also Washington Materials, Inc. v. NLRB*, 803 F.2d 1333, 1340–41 (4th Cir.1986) (same). As the Seventh Circuit concluded in *Eldorado*, "to ascribe any motive to [this] discharge[ ] other than a long overdue intolerance of [Senff's] offensive and disruptive acts would be to indulge in unwarranted speculation." 660 F.2d at 1214.

The majority's analysis violates the time-honored principle that enough is enough. Yes, the company rehired Senff. But to suppose that "Senff's value as an employee outweighed the cost of keeping him" until he engaged in union activities is to engage in pure speculation. Maj. op. at 825. The cost-benefit calculus is not so simple. The costs of Senff's behavior must reflect some notion of cumulation, some recognition that the twenty-fifth instance of tardiness is worse than the first or the fifth. The marginal aggravation of each instance is not identical to the one before it. At some point, the marginal cost becomes too much, especially in view of Senff's avowed intention to impose those costs in perpetuity.

Likewise, the benefits of retaining a problem employee are not necessarily constant, but can vary according to extrinsic conditions unrelated to union activity. For instance, Senff's value to the company might temporarily increase if there were a transitory shortage of good deckhands, or if the company's stock of experienced deckhands declined because of workforce changes. It is not surprising that a company might rehire a problem employee: Garvey Marine may have needed an experienced deckhand and rehired Senff in the hope he had learned his lesson.

The majority's insistence that Garvey Marine "persuasively explain what change of circumstances—other than his union activity—induced it to change its position and again fire Senff" places too high a burden on employers. *See* maj. op. at 825. A reasonable circumstance for termination is the accumulated irritation of Senff's relentless, in-your-face tardiness. The majority's "changed circumstances" rule makes little sense in a case like this where "any reasonable employer would find ... [the employee's conduct] objectionable and ... be expected to react with some form of discipline." *Decision* at 29. Are we to suppose that the employer must tolerate misconduct so long as the problem employee maintains the same level of insubordination? That, I am afraid, is where the majority's theory leads.

I am also unconvinced that a bargaining order is warranted, especially once Senff's termination is removed as a justification. A bargaining order is an extreme remedy. *See Flamingo Hilton–Laughlin v. NLRB*, 148 F.3d 1166, 1170 (D.C.Cir.1998); *Skyline Distrib. v. NLRB*, 99 F.3d 403, 410 (D.C.Cir.1996); *Avecor, Inc. v. NLRB*, 931 F.2d 924, 938–39 (D.C.Cir.1991). The unfair labor practices here were not so outrageous that an injunction and an assurance against retribution would not ensure a fair

re-run election, especially given the substantial turnover among the pilots (the perpetrators of the ULPs) and the deckhands (the victims). *See* maj. op. at 828 (noting turnover). I am not persuaded that speculative arguments such as the "legacy of coercion" will survive in the "lore of the shop" sufficiently justify the Board's order. *See Decision* at 5–6. At the least, if the Senff unfair labor practice were not upheld, the Board ought to reconsider the scope of the relief.