Rehearing en banc granted by order
filed 7/5/01.  Panel decision filed
2/16/01 is vacated.

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

OVERNITE TRANSPORTATION COMPANY,
Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent,

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,
Intervenor.

No. 99-2494

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.

OVERNITE TRANSPORTATION COMPANY,

Respondent,

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,
Intervenor.

No. 00-1065

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board
(18-CA-13394, 18-CA-13481, 18-CA-13642, 18-CA-13438,
18-CA-13484, 18-CA-13394-51, 18 RC-15812, 18-CA-13394-35,
18-CA-13395-36, 9-CA-33793, 18-RC-15814, 18-CA-13394-27,
8-RC-15786, 18-RC-15782, 18-CA-13394-91, 18-CA-13394-13,
18-RC-15768, 18-CA-13916, 4-RC-18747, 5-RC-14213,
9-RC-16504, 9-RC-16505)

Argued: June 8, 2000

Decided: February 16, 2001

Before NIEMEYER and KING, Circuit Judges, and
Irene M. KEELEY, United States District Judge for the
Northern District of West Virginia, sitting by designation.

_____

Petition for review denied and cross-application for enforcement
granted by published opinion. Judge King wrote the majority opinion,
in which Judge Keeley joined. Judge Niemeyer wrote a dissenting
opinion.

_____

## COUNSEL

**ARGUED:** Kenneth T. Lopatka, MATKOV, SALZMAN, MADOFF
& GUNN, Chicago, Illinois, for Overnite. William Maurice Bern-
stein, Senior Attorney, NATIONAL LABOR RELATIONS BOARD,
Washington, D.C., for Board. Carey Robert Butsavage, BUTSAV-
AGE & ASSOCIATES, P.C., Washington, D.C., for Teamsters. **ON
BRIEF:** Kenneth F. Sparks, Christopher A. Johlie, MATKOV,
SALZMAN, MADOFF & GUNN, Chicago, Illinois, for Overnite.
Leonard R. Page, General Counsel, Linda Sher, Associate General
Counsel, Aileen A. Armstrong, Deputy Associate General Counsel,
NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for
Board. Marc A. Stefan, BUTSAVAGE & ASSOCIATES, P.C.,
Washington, D.C., for Teamsters.

_____

## OPINION

KING, Circuit Judge:

Overnite Transportation Company petitions for review of the Deci-
sion and Order (the "Order") entered against it on November 10,
1999, by the National Labor Relations Board (the"Board"). Pursuant
to its statutory authority and the Supreme Court's decision in NLRB
v. Gissel Packing Co., 395 U.S. 575 (1969), the Board affirmed its
Administrative Law Judge ("ALJ"), directing Overnite to bargain with
the International Brotherhood of Teamsters, AFL-CIO, and its affili-

2

ated local unions (collectively the "Union") at four of Overnite's service centers. The Board has cross-applied for enforcement of its Order. For the reasons explained below, we deny Overnite's petition for review and grant the Board's cross-application for enforcement.

I.

A.

Our recitation of the facts is drawn in significant part from the ALJ's Decision of April 10, 1998 (the "Decision"), which was affirmed by the Board as to "rulings, findings, and conclusions as modified." Overnite Transp. Co., 329 N.L.R.B. No. 91, 1 (Nov. 10, 1999).**1** As the facts reveal, this is a complex proceeding arising in the context of a campaign advanced by the Union to organize the bulk of Overnite's 175 service centers throughout the country. The Union alleged, inter alia, that Overnite had granted a discriminatory wage increase in March 1995 to non-Union employees only, in an unlawful attempt to discourage its employees from supporting the Union, thereby violating sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act (the "Act").**2** The Union also asserted that Overnite undermined fair elections by engaging in various and pervasive unfair labor practices at specific service centers. The Board's General Coun-

_____
**1** All references to the Order, along with the ALJ Decision attached thereto, are cited accordingly.
**2** Section 8 of the Act provides in pertinent part as follows:

> It shall be an unfair labor practice for an employer--
>
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights [to engage in union activities] . . . ;
>
> . . .
>
> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization ... ;
>
> . . .
>
> (5) to refuse to bargain collectively with the representatives of his employees . . . .

29 U.S.C. § 158.

sel subsequently issued a consolidated complaint against Overnite, alleging that the company had violated the Act in several respects during the Union's organizing campaign. On July 29, 1995, the General Counsel and Overnite entered into a partial settlement agreement with respect to the consolidated complaint, which the Board approved and incorporated into a decision of September 6, 1995.**3**

After the partial settlement, several issues remained for resolution by the ALJ, relating primarily to whether <u>Gissel</u> bargaining orders were warranted at seventeen of Overnite's individual service centers.**4** The parties thereafter agreed to litigate a sampling of the seventeen

---

**3** The partial settlement agreement addressed a number of the Union's section 8(a)(1) and 8(a)(3) allegations arising out of the 1995 discriminatory wage increase. It dealt with conduct for which the only remedy required was a cease and desist order. In broad terms, the agreement recognized that the Board could forthwith enter an order:

> 1) prohibiting Overnite from engaging in practices including the "grant [of] wage or benefit increases motivated by a desire to thwart a representation campaign," and soliciting grievances or making threats tending to discourage union representation; and
>
> 2) directing Overnite to affirmatively take certain actions, such as
>
> a) providing monetary relief to employees at the Kansas City (Missouri), Blaine (Minnesota), Indianapolis (Indiana), and West Sacramento (California) terminals to compensate for the withheld March 5, 1995 wage increase, and
>
> b) posting notice of the settlement stipulations at all of Overnite's terminals.

<u>See</u> J.A. 91-97. All issues relating to conduct that would support remedies beyond a cease and desist order were expressly excluded from the partial settlement agreement.

**4** In <u>Gissel</u>, the Supreme Court recognized that the Board may properly exercise its remedial authority by issuing a bargaining order when "an employer has succeeded in undermining a union's strength and destroying the laboratory conditions necessary for a fair election[.]" 395 U.S. at 612. Accordingly, such bargaining orders are commonly referred to simply as "<u>Gissel</u> orders."

_Gissel_ cases, on the premise that a limited decision by the ALJ would assist them in determining how to advance with the remaining issues. By the terms of the partial settlement, the General Counsel reserved the right to use any relevant and admissible evidence, including evidence pertaining to allegations resolved therein.

In his Decision, the ALJ determined that Overnite had committed unfair labor practices affecting employees on both a nationwide and a unit-specific basis. The ALJ proceeded to find that such conduct justified issuance of _Gissel_ orders at four of Overnite's service centers, i.e., those located in Lawrenceville (Georgia), Louisville (Kentucky), Norfolk (Virginia), and Bridgeton (Missouri). The Board, by its Order, adopted the ALJ's Decision and directed Overnite to bargain with the Union at those four service centers. Overnite petitions for review of the Board's decision on the _Gissel_ orders, and the Board cross-applies for enforcement of its Order.

B.

In the exhaustive findings set forth in his Decision, the ALJ catalogued multiple violations of the Act by Overnite, consisting of both national violations and unit-specific violations. Those findings are summarized below.

1. National Violations

Two specific violations were found by the ALJ and the Board to have been committed by Overnite on a system-wide basis. These national violations consist of a pair of discriminatory wage increases, in violation of sections 8(a)(1) and 8(a)(3) of the Act, the first taking effect in March 1995, and the second in January 1996.

a. The March 1995 Wage Increase

At the core of this proceeding -- and a key justification for issuance of the four _Gissel_ orders -- is the nationwide wage increase granted by Overnite to its non-Union employees in March 1995. Beginning in 1991, Overnite had departed from its practice of granting across-the-board raises to its hourly employees each October;

Overnite instead deferred the raise anticipated in October 1991 until January 1992, granting additional small hourly increases in January 1993 and January 1994. Along with its 1994 hourly increases, Overnite introduced a performance incentive plan (PIP), which provided for employee bonuses if the company met its quarterly and annual earning targets. Due to its disappointing financial performance, however, Overnite awarded only one quarterly PIP bonus in 1994.

Attributable perhaps to employees' unfulfilled bonus expectations, the Union stepped up its organizing efforts in September 1994. Overnite's president at the time, Thomas Boswell, responded aggressively to the Union organizing effort in a November 22, 1994 letter to the employees, in which he warned:

> I guarantee you, based on what they have done at other companies, the Teamsters will not help us to better make our targets or pay you bonuses or salary increases. . . . The long lasting record of the Teamsters is not just that they failed to deliver on their promises, but that when their demands have been met, trucking companies have often lost the battle to survive.

Overnite, 329 N.L.R.B. No. 91 at 17. Similar warnings were made in a December 7, 1994 letter that Overnite distributed to drivers and dock workers in Los Angeles who were attempting to organize. Id. Overnite invoked the Union experience at its Chicago facility, declaring that "just like in Chicago, after the Union was unable to keep the wild promises it made before the vote, it called the employees out on strike." Id. The December 7 letter ominously concluded: "Do you see any good reason to bring this outside Union in, pay your money to it, and at the same time run the risk of tearing apart everything you now have?" Id. at 18.

These anti-Union statements were a harbinger of the first discriminatory wage increase, conceived in January 1995, when Jim Douglas replaced Boswell as Overnite's president. Just before he left, President Boswell had proclaimed that non-Union employees would receive a 3.5% increase, effective January 1, 1995. Boswell also

6

revealed certain other workplace improvements, calculated to appease the employees.[5]

When Jim Douglas took over, however, he immediately determined that employees should be given an additional raise. On February 10, 1995, President Douglas announced the "highest annual hourly raise in Overnite's history," effective March 5, 1995. He advised the Union, however, that employees in the represented units[6] would not receive the raise, unless negotiated through collective bargaining. The March 5, 1995 wage hike, as the ALJ aptly noted,"was not granted silently." Id. at 21. Overnite's management heralded the increase in the company newsletter, The Overniter, while emphasizing that employees in the four represented units would have to wait until wage issues were settled through Union negotiations. Id. Reviewing the company's conduct in this regard, the ALJ concluded:"The clear implication was that a vote for the Teamsters forfeited any benefits given by [Overnite] to the nonunion employees." Id.

Overnite further resisted the Union's widespread organizational efforts by holding out the prospect of certain non-wage concessions. For example, employees were advised that President Douglas was committed to increasing the drivers' speed limits, in order "to make the drivers happy." Id. "Only Douglas could deliver. The Teamsters could not, Overnite repeatedly claimed, as shown by its dealings with the Union in Chicago, where Local 705 was certified in 1982 and bargaining had little favorable results for the Teamsters." Id. at 22. Analyzing Overnite's characterization of the Chicago experience, the ALJ further found that the company "explained it in a way that made it implicit that [Overnite] had no intention of bargaining in good faith . . . [giving] the impression that bargaining would be futile." Id. Overnite drew attention to the Chicago standoff to communicate "that the

_____

[5] The ALJ made clear that this was essentially Overnite's standard, yearly wage increase, and, as such, unobjectionable. Overnite, 329 N.L.R.B. No. 91 at 18.

[6] As of March 1995, the represented units -- that is, those locations at which the Union acted as collective bargaining representative -- consisted of the company's service centers in Kansas City, Indianapolis, West Sacramento, and Blaine.

only way that the Teamsters could bring pressure on Overnite was by striking." Id.

President Douglas travelled extensively to certain of Overnite's service centers in early 1995, personally meeting with employees to convey his commitment to responsive management. Although Douglas insisted that his conversations with employees were intended simply to introduce them to his management style and his direction, the ALJ found that their real impact was to "draw the difference between him and Boswell and to emphasize that he looked upon the employees more favorably and would take care of them." Id. at 19. His discussions with employees encompassed wages, overtime, and benefits, i.e., the fundamental terms and conditions of employment, and the ALJ found that "Douglas's purpose was to explore and remove the employees' concerns." Id.

Consistent with Douglas's efforts, Overnite promoted a "Give Jim a Chance" campaign, distributing shirts and buttons emblazoned with that slogan. Id. at 20. This message was borne by a corps of "troubleshooters" dispatched by Overnite to identify the sources of employee unrest. Id. A "group of roving, solid supporters" of Overnite, these "troubleshooters" were assigned to travel from service center to service center, soliciting grievances and reporting them back to Overnite's headquarters. Id. The ALJ found that the troubleshooters' solicitations contained an implied promise to resolve the grievances. Id. In effect, the ALJ found that Overnite, under Douglas's direction, actively sought and acquired knowledge as to "what the employees were so dissatisfied about and why they were seeking out the Teamsters." Id. at 20-21. Equipped with that knowledge, the company took measures -- the discriminatory 1995 wage increase, most prominently -- designed to convince the employees that only the company could solve their problems. Id. at 22.

b. The January 1996 Wage Increase

The second of the two discriminatory wage increases was implemented by Overnite in January 1996, arising from a series of events chronicled in the ALJ's Decision. In early 1995, Overnite enlisted the services of management consultants who recommended substantial operational changes, including the closure of service centers, route

8

changes, and decreased hours. Id. at 55. To make these proposed changes more palatable to employees, President Douglas and other Overnite officials decided to propose a fifty-cent-per-hour wage increase -- to be funded by significant productivity-boosting measures. Id. at 56. Accordingly, Overnite drafted a productivity agreement setting forth the hourly raise, along with other enhancements to insurance benefits and overtime pay. These benefit increases were conditioned on the Union's national committee consenting to Overnite's right, inter alia, to "`[s]et, change and cancel days and hours of work' for all job classifications" and to set driving schedules, routes, and running times. Id. at 57.

Overnite pitched the productivity agreement to its employees in December 1995. The ALJ characterized the company's tactics as follows:

> What Overnite did here was to send by overnight mail its productivity agreement to the Union, wait 1 day, and then make its presentation to the employees directly, 2 days before negotiations were to or did resume. That bypasses the Union in the same way as if [Overnite] never made any proposal at all to the Union, and Overnite certainly gave the Union no adequate opportunity to digest the proposal or to respond or to begin discussion.

Id. at 58. Ultimately, the Union's national committee rejected the proposed productivity agreement, and Overnite unilaterally granted the fifty-cent increase to employees at ninety-three percent of its service centers -- all those except the represented units-- "continuing its established practice of yearly increases and holding back on only the ones that had voted for the Teamsters." Id. at 59.

Overnite then took measures to ensure that this discriminatory wage increase would be noticed by its employees. Indeed, the ALJ found that Overnite "publicized the withholding of the increase to demonstrate that voting for the Teamsters presented serious, adverse consequences." Id. at 60. The company flaunted its actions, and it "distributed [anti-union] campaign flyers stating that employees in the represented units were 50 cents per hour behind nonunion employees after the 1996 wage increase and blamed the Union for refusing to

9

allow the employees it represented to accept the increase and refusing to bargain above the increase." Id.

2. The Unit-Specific Violations

In addition to the national violations, the ALJ found that Overnite had committed scores of unfair labor practices at the four Gissel locations.

a. Lawrenceville

In late 1994, the Union began organizing at Overnite's Lawrenceville, Georgia service center. A representation election was conducted four months later, in April 1995. The Union lost the election, by a vote of forty-two to thirty-eight, and thereafter complained of Overnite's pre-election misconduct.

The ALJ found that Overnite engaged in a series of unfair labor practices at Lawrenceville during the election campaign. For example, Overnite was found to have restricted access to bulletin boards that had previously been available for employee postings. Overnite's "purpose was to discourage the employees in their campaign[,]" and the ALJ concluded that Overnite had thereby violated section 8(a)(1) of the Act. Id. at 34. Other unfair labor practices found by the ALJ to have been committed by Overnite included:

> - Lawrenceville manager Bill Carter "gave the impression to [an employee] that he was monitoring union activities[.]" Id.
>
> - Carter announced to a group of employees that he had attended a management conference, and that Overnite, under Douglas's management, was pursuing solutions to employee complaints regarding such issues as overtime policies and uniforms. The ALJ found that Carter's statements "unlawfully promised benefits in order to discourage employees from supporting the [Union]." Id.
>
> - Carter threatened to get rid of employees if they voted to be represented by the Union. Id. at 35. Indeed, he admit-

10

ted telling two employees that he could have fired them for certain incidents; if they were to vote in the Union, he would not be as lenient. Id.

- An Atlanta manager, Roger Schager, conducted several mandatory meetings for the Lawrenceville employees at which he made illegal threats of closure and employee job loss. He projected that if Overnite had to operate under a Union contract, it would be forced to go out of business. He also warned that other trucking companies had not been able to survive unionization. Id.

- After screening an anti-union film at one such meeting, Schager reportedly told an employee: "[I]f you want a Union job why don't you go and get a Union job with a company that is a Union company." Id. at 36. On another occasion, he unlawfully offered to help employees get jobs with union carriers if they were dissatisfied with Overnite's non-union status. Id.

- Schager also recounted the Chicago experience to a group of employees; Schager told them that the Chicago unit still did not have a contract after protracted negotiations, but he neglected to mention Overnite's culpability. Id. As the ALJ observed, "[b]y Schager's omission of any reference to the Board's finding that Overnite bargained in bad faith, [Overnite] implied that bargaining would be futile, lasting for years without any possibility of agreement." Id.

- Similarly, in March 1995, Lawrenceville dispatcher Mike Rivers told a group of employees that employees at the Kansas City service center had not received the March 5 pay raise, despite having voted for Union representation. He added that, based on what the company's lawyers had told him, Overnite would never sign a Union contract. Rivers asked the employees to look at what had happened at the Chicago service center, reminding them that the Chicago employees had been represented by the Union for ten to thirteen years and still did not have a

11

contract. Like Schager, he advised Lawrenceville employees that all Overnite had to do was bargain in good faith. Id. at 37.

- In late March, Overnite's vice president of safety, Bobby Edwards, came to Lawrenceville and met with employees, speaking to them about Chicago in detail. Edwards told them that the Chicago employees had voted for Union representation and had been in negotiations with Overnite for about ten years but still did not have a contract. Additionally, he emphasized that employees at those service centers that had voted for Union representation in 1994 and 1995 would not receive the March 1995 pay raise because the raise was subject to collective bargaining. Id.

- At another meeting, Edwards repeated the remarks about Chicago, adding that all Overnite had to do was negotiate in good faith. Edwards also announced that the employees at the service centers that had voted for Union representation before March 5 would not receive the pay raise because it would be left "on the negotiating table." Id.

- While visiting the Lawrenceville service center, President Jim Douglas suggested to employees that they serve on committees to come up with better ways to spend benefit funds. This, the ALJ found, "amounted to soliciting grievances from employees with a promise to redress them." Id. at 38. Douglas further threatened "that management would change its attitude in the way it enforced its work rules" if the Union won. Id. Douglas advised one employee that if the Union's campaign were successful, everything, including the employees' jobs and benefits, would be jeopardized. Id.

b. Louisville

A coordinated Union organizing effort began at the Louisville, Kentucky service center in early October 1994. By late November, managers were soliciting employee grievances, in violation of section

12

8(a)(1) of the Act. See id. at 39. A representation election was held on March 17, 1995, and the Union lost by two votes, eighty-five to eighty-three. Id. at 43. The ALJ found that Overnite management, during the period leading to the representation election, engaged in numerous unlawful measures to, alternately, appease and threaten its Louisville employees. Overnite's illegal conduct was found by the ALJ to include the following:

- Louisville manager Dave Harmeier conducted a series of employee meetings, some impromptu and some mandatory, in which he promised to be responsive and encouraged employees to give the "new vision" of Douglas a chance. Id.

- Following this positive introduction, Douglas made a personal appearance at the Louisville service center a week before the scheduled election (about March 9 and 10). Douglas assured employees that he "was going to try and `straighten stuff out,'" and he specifically mentioned the wage increase and improved benefits. The ALJ found that, in the context in which they were extended, Douglas's promises were intended to dissuade employees from supporting the Union. Id.

- In tandem with these rosy promises, management "warned of the harm to employees that would result if the Union were successful." Id. at 40. One supervisor warned employees that Overnite would "play hardball" if the Union won, and everyone would have to work harder. Id. Another projected that "we'd all be out of work" if the Union were voted in. In short, the ALJ found that Overnite "threaten[ed] employees with the loss of their jobs and more onerous working conditions if they selected the [Union] as their bargaining representative." Id.

- At one meeting, Vice President Edwards told the employees that the Chicago facility still did not have any kind of contract, and that it had been at least ten years since the employees voted the Union in. Id.

13

- At other mandatory meetings, Edwards reported that the Union had won in Chicago in 1984 and that Overnite had been bargaining in good faith since then. Edwards added that all Overnite was obliged to do was offer five days' sick leave and "that was bargaining in good faith[.]" Id. If the Union were voted in, he projected, "then that means that [the Union] would start from scratch." Id. Edwards also said that at service centers that had voted in the Union, the pay raise would have to be negotiated, and if the Louisville employees voted in the Union, bargaining would be handled basically like negotiations in Chicago. Id.

- Edwards discussed Chicago at yet another meeting, recounting how company representatives would show up, charges would be filed for bargaining in bad faith, Overnite would go to court and pay a small fine, and then it would not have to show up again until the following year. Id.

- On several occasions, Edwards and Harmeier made predictions about unionization to employees assembled for mandatory meetings. Once, Edwards pointed out that the Louisville employees would be receiving the March pay increase, but terminals that had voted a union in, such as Kansas City, would not because they would have to negotiate first. Id. Another time, Edwards opined that the only way employees would get a contract was to go on strike, and if they did, they could be replaced. Id. Harmeier also stated that the only leverage the Union had in bargaining was to call a strike, and warned that the Union could do so without a vote by the employees. Id.

- Louisville supervisors also took measures to impede the employees' statutory right to distribute and read Union literature. The ALJ found that, on one occasion, a supervisor "literally pulled [Union] papers out of the hands of one employee who was reading it and threw it in the trash." Id. at 41.

14

- On the Friday night before the election, an Overnite supervisor told an employee that Harmeier had instructed him to get rid of all Union literature during the last week of the campaign. Id. At about the same time, a "Teamsters Graveyard" poster was put up in the break room, depicting the gravestones of unionized trucking companies; among them was an Overnite headstone with an open grave and a question mark. Id. at 21 n.10.

c. Norfolk

The Union organizing campaign began at the Norfolk, Virginia service center in January 1995. A representation election was held on March 3, 1995. The Union lost by a vote of fifty-eight to twenty-nine, and objected to Overnite's illegal pre-election conduct. As in Lawrenceville, Overnite was found by the ALJ to have violated the Act by impeding its Norfolk employees in their use of company bulletin boards for Union literature. More specifically, Overnite removed Union literature from bulletin boards that had been made available for the employees' general use. Id. at 48. Norfolk manager Michael Mendenhall threatened to fire employees for posting an NLRB form on one such bulletin board. Id. The ALJ found that Overnite engaged in a number of other unlawful practices leading up to the election at Norfolk, including:

- Supervisors told employees that, among the adverse consequences of voting in the Union, they would lose the March 5, 1995 pay raise. Id. at 47-48.

- Mendenhall told employees that the good things Overnite had planned would be postponed because the company would have to divert the funds to keep Overnite nonunion. Id. at 48. The ALJ further found that Mendenhall "gave some instructions about the way the union campaign was to be run," informing employees that "he would not stand for any union literature on his bulletin board." Id. (emphasis in original).

- In late February 1995, Mendenhall conducted a lengthy meeting attended by about twenty-five employees. He

15

began the meeting by stating that the Union had filed a petition for an election and that any of the service centers that voted in the Union before March 5 would not receive the pay increase scheduled to take effect that day, because the increase could not be established in the absence of contract negotiations. He further remarked that the service center in Chicago had not settled on a contract after thirteen years of negotiations. Id.

- Mendenhall told the employees that he would not tolerate conversations about the Union while employees were working or at the workplace, and that if they did not comply with that policy, they had better be careful. Prior to the Union campaign, company policy was that employees could talk to one another as long as their conversation did not interfere with their jobs. Id. at 48-49.

- During the week following the February meeting, employee David Spaugh, an outspoken Union supporter, asked Mendenhall how long it would be before he would be fired if the Union lost the election. Mendenhall replied: "Everyone will be held accountable." Id. at 49. On March 14, Mendenhall told Spaugh and fellow employee Rich Williams that Williams had become an "agitator." Id. He warned that he did not want to see anything bad happen to either of them because of the Union campaign, and that they should be careful. Id.

- At various other mandatory meetings, Mendenhall made additional predictions about the consequences of unionization. For example, he repeated that the Kansas City employees would not be getting the March pay increase because they had voted the Union in. Id. at 47. He also boasted that in the thirteen years the Union had represented employees at the Chicago service center, there had never been a contract. If the Union were to prevail at Norfolk, he projected, the same scenario would play out in Norfolk: Overnite would negotiate in good faith, but the employees would never get further than their vote. Id. at 50.

16

- At one or more of the meetings, Mendenhall also told the employees that if the terminal voted for Union representation, "business would be rerouted around them" and their hours might be cut. Id. As an example, he cited the experience at Kansas City, where "word was" that this was happening. Id.

- On several occasions, Mendenhall threatened employees with unspecified retaliation, letting them know that he "was not going to stand for insubordination." Id. at 49. Moreover, he was found to have denied pro-union employees the same opportunities to speak at the mandatory meetings as anti-union employees, "cut[ting] short employees who made pro-union comments or asked questions for clarification." Id. at 50.

- Management threatened employees with the loss of the company's 401(k) pension plan. Id.

- In the weeks before the election, Norfolk supervisors gave "Vote No" hats to those employees who were going to vote against the Union, which the ALJ found to constitute interrogation of employees about their union sympathies. Id. at 49-50.

- In February, a supervisor told a group of eleven or twelve employees that if the Union were to win, they would lose their jobs. Moreover, if the Union were to strike, they would lose their jobs and Overnite probably would not call them back. That same day, another supervisor told an employee that the employees were going to get a fifty-cent-per hour raise, but if the Union were voted in, they would "lose it." Id. at 50.

- On March 14, a supervisor told a Norfolk employee that he was "afraid" for himself and Overnite if the Union got in. He expressed his concern that Overnite would not be able to pay the Union scale, and that the employees should look at the union companies that had gone out of business. Id. at 49.

17

> - An employee complained that supervisors "`watched [him] like a hawk' and stayed within listening distance." Id. at 50. The ALJ determined that not only did supervisors create an impression of surveillance, but that "there was actual surveillance and monitoring in violation of Section 8(a)(1) of the Act." Id.

> - The former Norfolk manager was sent to assist with the anti-union campaign. The ALJ found that he unlawfully "told employees that Douglas was working on improvements of the workplace and benefits, an implied promise of those improvements; impliedly promised the termination of the [terminal manager], if that would change employees' pro-union sympathies; and informed employees that strikes were inevitable[.]" Id. at 51.

d. Bridgeton

The Union began an organizing campaign when Overnite opened a new service center in Bridgeton, Missouri, in December 1994. A representation election was scheduled for and held on February 28, 1995. The Union lost by two votes, twenty-four to twenty-two, and filed objections to Overnite's pre-election conduct.

In January 1995, Bridgeton manager Walter Grimes began illegally monitoring one of the most steadfastly pro-Union drivers -- "even checking the bathroom" -- to ensure that he was not engaging in organizational activities. Id. at 53. Along with illegal monitoring, the ALJ found numerous other pre-election violations, including:

> - Grimes removed union literature posted on the company bulletin board, left on tables in the break room and in the employee bathroom. While removing the pro-Union literature, the manager allegedly remarked that he "[didn't] like seeing that shit hanging on his board." Id.

> - In January and February, local supervisors ended conversations between Union supporters and other employees. On the other hand, conversations between anti-union

18

employees and others were left undisturbed. Around the same time, Grimes asked a union supporter what the employees wanted. When that employee said overtime and better benefits, Grimes responded: "They are in the works." Id. at 54.

- Overnite's "troubleshooters" arrived in the Bridgeton-St. Louis area around February 5 and stayed until February 14, riding with all the drivers except the two most active union supporters. Id. at 53.

- One such troubleshooter, Andy Hamilton, told a driver that Overnite wanted to make its employees happy, accommodating them by improving benefits and inviting more employee input. After the driver mentioned that overtime would make the company a better place to work, Hamilton assured him that it was in the works. Hamilton also told the employee that he would look into the idea of an employee committee that would participate in selecting the benefit package, but advised him that "we don't need a third party at Overnite." Id. at 53-54. When another employee made similar suggestions about benefits and overtime pay, Hamilton told him those things were in the works. Id.

- During the pre-election period, Overnite sent the former Bridgeton Manager Jeff Woods, Operations Director Morgan, and President Douglas to speak to the Bridgeton employees. In February, Woods told employees that Overnite was looking into overtime and, although he could not make any promises, he was "pretty sure" it was going to happen and that it was "almost a sure thing, almost a done deal." Id. at 54. Woods warned that the Union "would not work within the Overnite environment" and that, as a result, the benefit improvements Overnite was trying to make would be lost. Finally, just a week before the election, he urged employees to give the new management a chance. Id.

- About two weeks before the election, Operations Director Morgan spoke at a mandatory meeting of about fif-

19

teen employees. He responded to questions about overtime pay by telling them that Douglas had taken over as president and, although he could not promise them anything because of the Union campaign, Douglas was looking into these problems and devising solutions. Id. On the same day, Morgan informed a group of employees that it was not too late to come up with non-Union solutions to employee grievances. When one employee remarked that other companies had better wages and benefits, but that Overnite's profits were higher, Morgan replied that these were the sorts of problems that they needed to present to Douglas, and that they ought to give Jim a chance. Id. at 55.

- President Douglas made several visits to Bridgeton prior to the election, speaking with employees about benefits, including overtime pay. During one such conversation, Douglas queried, "What if we gave you overtime at say, over 45, 48 hours, but we maybe lessen something here," adding that they were looking into medical benefits. Douglas proceeded to discuss the pros and cons of overtime pay. Id. at 54.

- In another conversation, Douglas responded to an employee question about overtime pay after eight hours a day or forty-eight hours a week by asking "how about" after forty-five or forty-eight hours a week, because Overnite would not pay for the hours mentioned. Id. at 55. About a week before the election, Douglas told a Bridgeton employee that overtime after forty-seven or forty-eight hours would be beneficial, but that Overnite was not considering overtime after shorter periods. Id.

- Two weeks before the election, Douglas held a meeting with about twenty to twenty-five employees. He announced that he wanted to know what was on their minds, and that he was trying to change things for the better. In response to employee questions about matters such as overtime, uniforms, sick days, and medical benefits, Douglas assured employees that he was looking into

20

such matters. The company, Douglas asserted, could take care of its own and did not need third-party interference. Id.

C.

As we have noted, the Board, after consideration of the extensive record and the Decision of the ALJ, affirmed the ALJ's "rulings, findings, and conclusions as modified[.]"**7** Importantly, the Board expressly ratified the ALJ's finding "that the withholding of the March 1995 increase from the union-represented employees was unlawfully motivated and violated Section 8(a)(3) of the Act." Id. at 4. In the Board's view, Overnite's wage manipulations were intended to convey the message that employees "could choose to remain unrepresented and enjoy any pay increase [Overnite] might grant in the future, or they could vote for union representation and forego such benefits." Id. at 3. The Board also found that Overnite violated sections 8(a)(1) and 8(a)(5) of the Act in "bypassing the union and dealing directly with employees in the eight recognized and six contested units with respect to its 1996 productivity package," and violated sections 8(a)(1), 8(a)(3), and 8(a)(5) "by unilaterally and discriminatorily withholding the wage and mileage increases from those same employees." Id. at 4.**8** The Board agreed with the ALJ that Overnite violated section 8(a)(3) of the Act when it announced and granted to unrepresented employees the overtime portion of the productivity package "in order to dissuade them from seeking union representation." Id.

_____

**7** The Board's modifications leave intact all but two of the specific violations identified by the ALJ; neither affects the propriety of the decision to issue Gissel orders at the four contested service centers. See Overnite, 329 N.L.R.B. No. 91 at 1.
**8** As of December 11, 1995, Overnite had recognized and commenced bargaining with the Union as the representative of units of employees at its service centers in Chicago, West Sacramento, Kansas City, Blaine, Indianapolis, Grand Rapids, Miami, and Tucson. Id. at 56. Along with these eight recognized units, there were six contested units for which the Board had certified Union locals, but Overnite refused to recognize them -- St. Louis, Milwaukee, and Rockaway (New Jersey)-- or where Board certifications were pending -- Romulus (Michigan), North Canton (Ohio), and Atlanta. Id.

21

Based on its evaluation of the severity and lasting inhibitive effect of these violations, the Board then concluded that Overnite's "unfair labor practices cannot be adequately remedied at the present time by the Board's traditional remedies." Id. at 6. Accordingly, the Board adopted the recommendation set forth in the ALJ's Decision, and it issued Gissel orders with respect to Overnite's Lawrenceville, Louisville, Norfolk, and Bridgeton service centers. These four Gissel orders -- directives from the Board for Overnite to bargain collectively with the Union as the representative of its employees-- form the basis for the proceedings in this court.

II.

Under section 10(e) of the Act, "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record as a whole shall be conclusive." 29 U.S.C. § 160(e). We therefore review the Order to determine if it is supported by substantial evidence on the record as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 490-91 (1951). If the ALJ's findings of fact, as adopted by the Board, are supported by substantial evidence, then "our inquiry ends . . . even though we might have reached a different result had we heard the evidence in the first instance." NLRB v. Daniel Constr. Co., 731 F.2d 191, 193 (4th Cir. 1984) (citation omitted).

We have characterized substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." NLRB v. Peninsula Gen. Hosp. Med. Ctr., 36 F.3d 1262, 1269 (4th Cir. 1994). We have also recognized that while "substantial evidence" is more than a scintilla, it may also be less than a preponderance. AT&T Wireless PCS, Inc. v. City Council of Virginia Beach, 155 F.3d 423, 430 (4th Cir. 1998). Where the "record is fraught with conflicting testimony and essential credibility determinations have been made," we must give particular deference to the ALJ's findings and the Board's conclusions. NLRB v. Nueva Eng'g, Inc., 761 F.2d 961, 965 (4th Cir. 1985) (citing NLRB v. Air Prods. & Chems., Inc., 717 F.2d 141, 145 (4th Cir. 1983)). We must also affirm the Board's conclusions applying the law to the facts, provided they are reasonable and consistent with the Act. See NLRB v. Yeshiva Univ., 444 U.S. 672, 691 (1980). Ultimately, of course, courts "remain the final

22

authorities on issues of statutory construction." <u>Shanty Town Assocs. Ltd. v. EPA</u>, 843 F.2d 782, 790 (4th Cir. 1988).

Moreover, the courts have consistently recognized that the Board possesses broad discretion to craft appropriate remedies. Accordingly, the Board's chosen remedy should be enforced "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the NLRA." <u>NLRB v. Williams Enter. Inc.</u>, 50 F.3d 1280, 1289 (4th Cir. 1995). We have acknowledged, however, that an election, rather than a <u>Gissel</u> order, "remains the traditional, as well as the preferred, method for determining the bargaining agent for employees." <u>NLRB v. Appletree Chevrolet, Inc.</u>, 608 F.2d 988, 996 (4th Cir. 1979) (<u>Appletree I</u>). We therefore "exercise less deference" and require "scrupulous specificity from the Board when it issues a mandatory bargaining order on the authority of [<u>Gissel</u>]." <u>Be-Lo Stores v. NLRB</u>, 126 F.3d 268, 274 (4th Cir. 1997). In any event, and notwithstanding the favored status of elections, the Board -- given its "fund of knowledge and expertise" -- must be accorded special respect by reviewing courts in fashioning a remedy. <u>NLRB v. So-Lo Foods, Inc.</u>, 985 F.2d 123, 126 (4th Cir. 1992) (quoting <u>Gissel</u>, 395 U.S. at 612 n.32).

III.

A.

In its 1969 <u>Gissel</u> decision, the Supreme Court recognized the Board's authority to issue remedial bargaining orders in two distinct situations. First, such orders may be appropriate in"Category I" cases, where "exceptional," "outrageous," and"pervasive" unfair labor practices have occurred, and where the coercive effects of such practices "cannot be eliminated by the application of traditional remedies." <u>Be-Lo</u>, 126 F.3d at 274 (quoting <u>Gissel</u>, 395 U.S. at 613-14). Second, and more typically, remedial bargaining orders may issue in so-called "Category II" cases, where the Board has found that: (a) the Union once had majority status; (b) such majority status was dissipated by the employer's pervasive misconduct; (c) the possibility of erasing the effects of these past pervasive practices and ensuring a fair election is slight; and (d) employee sentiment would, on balance, be better

23

protected by a bargaining order. Appletree I, 608 F.2d at 996 (quoting Gissel, 395 U.S. at 614).

In fashioning a remedy in Category II cases, the Board may consider the scope and severity of the unfair labor practices, with an eye to their past effect on election conditions and the likelihood of their recurrence in the future. See Gissel, 395 U.S. at 614. If the Board concludes that a fair election could not be adequately ensured by traditional remedies and "that employee sentiment once expressed through [union authorization] cards would, on balance, be better protected by a bargaining order, then such an order should issue." Id. at 614-15.

B.

Here, the Board expressly classified Overnite's conduct as falling within Category II. Under Gissel, the Board is empowered to order an employer to bargain with a union that has demonstrated majority support prior to erosion of that support by the employer's commission of unfair labor practices. As a threshold matter, therefore, we examine the factual underpinnings of the Union's employee support at the four service centers at issue.

1. Lawrenceville

The Board adopted the ALJ's finding that the Union had attained majority support at Overnite's Lawrenceville service center in February 1995. Overnite, 329 N.L.R.B. No. 91 at 33. As of February 25, 1995, the Lawrenceville unit comprised eighty-six employees, forty-five of whom were found by the ALJ to have endorsed valid petitions. Id. Overnite contested the majority support finding, claiming that the signed petitions on which the Board's finding was premised were "only for an election," and did not constitute an authorization for the Union to represent these employees.

The ALJ reasonably rejected this contention. The challenged petitions stated clearly that the signer "authorize[s] the [Union] . . . to represent me in collective bargaining." Such unambiguous language, absent affirmative proof that the signer was told that the petition would be used solely to obtain an election, entitles the signature to be

24

counted for the purpose of establishing majority support. <u>Gissel</u>, 395 U.S. at 606.

Here, Overnite simply failed to meet its burden. Its argument consists of an attack on the ALJ's credibility determinations, which are entitled to acceptance absent "exceptional circumstances." <u>See NLRB v. CWI of Maryland, Inc.</u>, 127 F.3d 319, 326 (4th Cir. 1997). The ALJ credited the card solicitors on the basis of their comparative demeanor and their recollections, which were "far better and clearer" than those of witnesses testifying to the contrary.**9** We discern no exceptional circumstances here, and we therefore conclude that the Board was entitled to adopt the ALJ's finding of majority support at Lawrenceville.

### 2. Louisville

The situation with respect to Louisville was much simpler than that at Lawrenceville. It is uncontested by Overnite that the Union enjoyed majority support at the Louisville service center. The ALJ determined that, on January 20, 1995, when the Union sought recognition as the employees' representative, "117 of 174 employees had signed cards designating the Union as their representative for the purposes of collective bargaining." <u>Overnite</u>, 329 N.L.R.B. No. 91 at 38. The Board reasonably relied on this uncontested finding in fashioning its remedy.

### 3. Norfolk

The ALJ also found that the Union enjoyed majority support in the Norfolk bargaining unit during the relevant period in 1995. <u>Id.</u> at 47. This finding is not challenged by Overnite. Accordingly, the Board properly adopted this finding for purposes of imposing its <u>Gissel</u> order.

_____

**9** As the ALJ noted, many of the employees "were afraid of the consequences of their act, now in the open, and were willing to do anything, even to give false testimony, to preserve their jobs and their good standing with their employer." <u>Overnite</u>, 329 N.L.R.B No. 91 at 33.

25

4. Bridgeton

The ALJ found that the Union enjoyed majority support at the Bridgeton facility from its inception. Id. at 52. Opened in December 1994, the Bridgeton facility was staffed entirely by employees transferred from the existing Hall Street (St. Louis) facility. Overnite's primary objection to the ALJ's finding of majority status at Bridgeton relates to whether authorization cards signed by former Hall Street employees, prior to their transfer, remained valid as to the emerging bargaining unit at Bridgeton.

The Board was entirely justified, on the record presented, in adopting the ALJ's finding "that the cards authorize the Union to represent the employees at Bridgeton." Id. As the ALJ observed:

> In the circumstances of this proceeding, [the cards] did not limit the Union to represent them only at Hall Street, especially because they were soon to transfer to the new service center. As a result, I reject Overnite's contention and will count the cards that were dated prior to the opening of the Bridgeton service center.

Id. Overnite contends that the ALJ erred in regarding as valid those authorization cards signed by former Hall Street employees prior to November 30, 1994 -- the date on which transfer assignments for the new Bridgeton terminal were posted. Since these employees did not know for certain that they would be transferred to the Bridgeton facility, Overnite insists that they could not have intended to authorize representation at Bridgeton. The company maintains that its employees' support of Union representation at Hall Street might have been based upon conditions peculiar to that facility, e.g., concerns about dioxin contamination.

We find Overnite's contentions unavailing. While the Bridgeton employees who signed authorization cards prior to November 30, 1994, may not yet have received confirmation of their transfer, they had demonstrated clear interest in Union representation. Overnite would have us reject those authorization cards simply because the employees did not specify their will to be represented at both service centers. The cases proffered by Overnite do not compel that position,

26

and we see no reason to adopt it.**10** Given the prominence of wage and benefit considerations in unionization decisions, we are loath to presume that employees who supported union representation at Hall Street would prefer to be unrepresented at Bridgeton. As the ALJ observed, "[e]xcept for the location and identity of supervision, nothing changed. The employees continued to perform the same work for the same employer with the same pay and benefits." Id. In our view, it was reasonable, and consistent with the Act, for the Board to adopt the ALJ's decision to count those cards signed prior to November 30, 1994, "even though [the employees] signed while not formally employed at the new facility." Id.

C.

Both the Board and the ALJ, presented with evidence establishing that the Union enjoyed majority support at each of the four relevant service centers, were further justified in concluding that Overnite's pervasive misconduct -- nationally and locally-- warranted Gissel orders for those four service centers.

1.

Specifically, the Board emphasized several "hallmark violations" committed by Overnite, practices so coercive that their very existence will support the issuance of a bargaining order unless some significant mitigating circumstance exists.**11** See So-Lo Foods, 985 F.2d at 126

_____

**10** Citing Koons Ford of Annapolis, Inc., 282 N.L.R.B. 506, 517 (1986), Overnite contends that "even if card signers knew that transfer was `possible' -- and no card signers testified to that-- Board law requires more than a `possibility.'" Koons, which addresses the validity of authorization cards signed by job applicants, is inapposite. The Bridgeton employees who signed cards prior to their transfer were personally invested in the company and its unionization status. Their situation is distinctly different than that of job applicants who have not been hired and whose knowledge of the terms and conditions of employment is extremely limited.
**11** The Board regarded as "hallmark violations" Overnite's "granting of an unprecedented wage increase, as well as threats that employees would lose their jobs and that the business would be closed if the employees selected the Union." Overnite, 329 N.L.R.B. No. 91 at 2.

(quoting <u>NLRB v. Jamaica Towing</u>, 632 F.2d 208, 212-13 (2d Cir. 1980)). Where hallmark violations have been committed, the seriousness of the conduct justifies a finding -- without extensive explication -- that the conduct is likely to have a lasting inhibitive effect on union elections. <u>Id.</u>

Although the presence of hallmark violations will presumptively support a <u>Gissel</u> order, the "mere presence of such a violation . . . does not automatically preclude a fair second election or mandate the issuance of a bargaining order." <u>So-Lo Foods</u>, 985 F.2d at 127 n.5 (quoting <u>J.J. Newberry Co. v. NLRB</u>, 645 F.2d 148, 153 (2d Cir. 1981)). In such instances, the Board must still scrutinize the specific misconduct in order to ascertain the potential for a free and uncoerced election. <u>See id.</u>

Here, the Board found the <u>Gissel</u> orders justified by Overnite's "highly coercive `carrot and stick' campaign," through which Overnite granted selective wage increases to its unrepresented employees, while communicating the futility of union negotiations and threats of plant closures. <u>Overnite</u>, 329 N.L.R.B. No. 91 at 3. As the Board recounted Overnite's wage manipulations:

> [I]n March 1995, at the height of the organizational effort, Overnite unlawfully granted its unrepresented employees an unprecedented wage increase, just months after the employees had received their normal (January) increase. . . . At approximately the same time that [Overnite] was illegally rewarding its unrepresented employees, [Overnite] proclaimed in the company newsletter that "unfortunately" employees at the "four certified centers" where the Union had recently won Board elections "will not get these pay increases," but "will have to wait for negotiations." . . . <u>The message that [Overnite's] combined actions sent to employees was unmistakably clear: they could choose to remain unrepresented and enjoy any pay increase [Overnite] may grant in the future, or they could vote for union representation and forego such benefits.</u>

<u>Id.</u> (emphasis added).

28

Although the March 1995 discriminatory wage increase reflected an especially strong hostility on the part of Overnite to the Union's organization efforts, it was not an isolated occurrence. Indeed, as the Board concluded, in granting benefits the following year, Overnite "again distinguished among its service centers based on their union or nonunion status." Id. In January 1996, Overnite again unlawfully -- and publicly -- withheld its wage increases from employees at Union-represented service centers, while distributing flyers blaming the Union for the lower wages of those bargaining units. See id. at 3. The Board characterized Overnite's tactics crisply:"[T]he message was clear: company wide wage increases would not be granted to employees who voted for the Union." Id.

While Overnite does not deny granting wage increases to its unrepresented employees in March 1995 and January 1996-- and conspicuously withholding the same from its represented employees -- it objects to the Board's evaluation of this conduct. These wage increases, Overnite insists, were not unlawful and were not intended to discourage Union representation efforts, nor were they particularly coercive in their actual impact. In this vein, Overnite objected to the ALJ's refusal to hear the testimony of its proposed expert witness. Had he been allowed to testify, the witness would have presented evidence purporting to demonstrate empirically that-- contrary to the "fist inside the velvet glove" premise espoused by the Supreme Court in NLRB v. Exchange Parts, 375 U.S. 405, 409 (1964) -- unlawful compensation increases do not cause unions to lose elections they otherwise would win.

2.

Relying on the decision in Skyline Distributors v. NLRB, 99 F.3d 403 (D.C. Cir. 1996), Overnite further asserts that an increase in benefits should rarely serve as the primary basis for issuance of a Gissel order. While a unilateral and discriminatory wage increase undeniably constitutes an unfair labor practice in violation of section 8(a)(1) of the Act, Skyline suggests that traditional remedies should not be presumed inadequate to address the effect of such an unlawful practice on union representation. See 99 F.3d at 411-12. In essence, Skyline takes up Overnite's challenge to the validity of the Supreme Court's Exchange Parts decision, and it proceeds to reject the premise that a

29

unilateral wage increase may be the sole justification for a Gissel order.

We recognize that the premise of Exchange Parts has come under fire, and that some courts -- including the D.C. Circuit in Skyline -- have cast aspersions on its validity as the basis for a Gissel order. We are unable, however, to subvert either the Supreme Court's decision in Exchange Parts or the numerous Board decisions founded on its premise. As Justice Harlan observed, "[e]mployees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged." 375 U.S. at 409. Where, as here, unlawful wage increases are accompanied by other unlawful practices reflecting anti-union animus, such as threats of job loss and statements about the futility of Union negotiations, the Board was fully entitled to conclude that traditional remedies would be insufficient to ensure fair elections at the four service centers.

Indeed, the Skyline court expressly recognized that a Gissel order is properly issued by the Board where "the employer's [unfair labor practices] combine an economic inducement with negative acts of reprisal." 99 F.3d at 410; see also St. Francis Fed'n of Nurses & Health Prof'ls v. NLRB, 729 F.2d 844, 855 (D.C. Cir. 1984) ("The Board placed particular emphasis on the unlawful wage increase because it affected all employees, but it also relied upon the whole litany of unfair labor practices that characterized the Hospital's anti-Union campaign -- interrogations, threats, and promises of benefits."). Given Overnite's additional violations-- in particular, its repeated narration of the Union's frustrated negotiations in Chicago -- Skyline's skeptical view of the impact of wage increases lacks persuasive force.

3.

Overnite included its Lawrenceville, Louisville, Norfolk, and Bridgeton service centers in its national campaign of promises and threats. It also committed a number of additional unfair labor practices at each of those four locations.

As the Board found, Overnite conducted a carrot and stick campaign at those facilities by repeatedly soliciting employee grievances

30

with express or implied promises to remedy them. Overnite also consistently reminded employees that unionized employees would not receive the March increase, but would instead have to wait for negotiations. The frustrated negotiations in Chicago were repeatedly invoked to remind employees of Overnite's aversion to union contracts.

The additional violations were numerous and pervasive. At one or more of the four service centers, company officials or supervisors threatened variously that unionization would cause Overnite to lose customers, go out of business and "shut the doors," and jeopardize "jobs, . . . benefits, and everything." Overnite further threatened loss of benefits, stricter discipline and work rules, and more onerous working conditions. Concurrently, Overnite was cracking down on its employees' Union activities at the four locations by unlawful threats of retaliation and loss of credibility, unlawful surveillance of Union activities and impressions of surveillance, stifling of conversations involving pro-Union employees, and unlawful restrictions on the use of bulletin boards.

We conclude that there is substantial evidence to support the Board's determination that the Union's majority status at the four contested bargaining units was dissipated by Overnite's pervasive unfair labor practices. To be "pervasive," an employer's unfair labor practices must "be felt throughout all, or virtually all, of the bargaining unit." Be-Lo, 126 F.3d at 280. In our Be-Lo decision, we regarded an employer's practices as not pervasive, primarily because less than six percent of Be-Lo's workforce was directly affected by the violations. 126 F.3d at 281. In sharp contrast, Overnite's nationwide, publicized, and repeated violations were felt throughout virtually all of the employer's operations. As the Board found in its Order, "[a]ll bargaining unit employees were directly affected by[Overnite's] misconduct." Overnite, 329 N.L.R.B. No. 91 at 3 (emphasis added).

D.

1.

Although there is no question that Overnite was guilty of a litany of serious and pervasive misconduct and continuing violations of the

31

Act, the issuance of a Category II bargaining order requires the Board to go beyond a mere finding that the employer engaged in unfair labor practices. The Board must also make specific findings as to the "immediate and residual impact of the unfair labor practices on the election process." Appletree I, 608 F.2d at 997 (citations and internal quotations omitted). The Board is to undertake "a detailed analysis" assessing the possibility of holding a fair election in terms of any continuing effect of misconduct, the likelihood of recurring misconduct, and the potential effectiveness of ordinary remedies. Id. "Even if the incidents of impermissible conduct are pervasive and erode a union's majority status, the Board must still carefully analyze, in record findings, the `continuing impact' of those violations." Be-Lo, 126 F.3d at 281.

In this regard, Overnite asserts, relying on our decision in Be-Lo, that the passage of four years, coupled with the departure of forty percent of its employees and high turnover in the company's management, combined to diminish the continuing impact of its unfair labor practices. Overnite insists that the Board erred in refusing to consider these factors as controlling evidence for a determination that fair elections are still possible.

2.

We must reject Overnite's contentions. We conclude that there is substantial evidence in this record supporting the Board's determination that the time lapse between the violations and the remedy did not militate against issuing the Gissel orders. The Board accurately observed that the four-year lapse did "not approach the time found to render the Gissel orders stale in some cases." Overnite, 329 N.L.R.B. No. 91 at 6. Given the size and complexity of the underlying proceedings, one must expect -- and accommodate -- the "ordinary institutional time lapse . . . inherent in the legal process." Id. (quoting Intersweet, Inc. v. NLRB, 125 F.3d 1064, 1068 (7th Cir. 1997)). It is true that, in some situations, a four year lapse may be entirely sufficient to permit a fair election. See, e.g., Be-Lo, 126 F.3d at 282 ("It strains credulity to believe that Be-Lo's unfair labor practices, such as they were, had such long-lasting effects that a fair rerun election could not have been held four years later."). However, in light of the severe and pervasive nature of the violations found to have been com-

32

mitted by Overnite in this case, the Board did not err on this point. We will not disturb the Board's careful determination that the circumstances "fully warrant[ed] the issuance of bargaining orders as a necessary and appropriate means of effectuating the policies of the Act." Overnite, 329 N.L.R.B. No. 91 at 6.

3.

We are similarly convinced that the Board did not err in concluding that Overnite's unfair labor practices had a "continuing impact" on the four service centers, notwithstanding that some employee turnover had occurred. In its Order, the Board emphasized its policy of assessing the situation at the time the unfair labor practices were committed, rather than considering personnel shifts that followed the misconduct. Id. "Otherwise," the Board reasoned,"the employer that has committed unfair labor practices of sufficient gravity to warrant the issuance of a bargaining order would be allowed to benefit from the effects of its wrongdoing." Id.

Although Overnite claims that the Board's position in this case differs from the approach we endorsed in Be-Lo, 126 F.3d at 282, the facts underlying the two cases are easily distinguishable. In Be-Lo, there was a turnover rate of over sixty-six percent, see id. at 283, whereas, in this case, the majority of employees exposed to Overnite's violations remain at the company and would recall those events. Overnite, 329 N.L.R.B. No. 91 at 5. Moreover, while employee turnover is among the factors to be considered, it is by no means dispositive of the "continuing impact" inquiry. It is, instead, "just one more factor . . . that militates against the substitution of a Gissel order for the more desirable means of ascertaining employee preferences embodied in a representation election." NLRB v. Apple Tree Chevrolet, Inc., 671 F.2d 838, 842 (4th Cir. 1982) (Apple Tree II). Where, as here, severe and pervasive unfair labor practices linger in the memories of the majority of Overnite's current employees, the company's attribution of error to the Board is misplaced.

4.

Finally, Overnite points to Union victories in 1996 and 1997 at three other facilities -- Toledo, Memphis, and Cincinnati -- as evi-

33

dence that free and fair elections were a possibility, thus negating the need for the Board to issue its Gissel orders. In effect, Overnite argues that the Union's election victories in some bargaining units undermines the Board's determination that the company's unfair labor practices would have a continuing impact on the Union's representation efforts elsewhere. The Board maintains, conversely, that the Union's ability to prevail in three isolated elections does not imply that a free and fair election could occur at the four service centers at issue in this case. In the Board's view, circumstances may exist that would allow the Union to be particularly robust in some bargaining units, even though Overnite's unfair labor practices would consistently tend to inhibit the Union's support.

Again, it is the Board's position that "[i]t is the objective tendency of the unfair labor practices to undermine union support that is critical, not the actual effect of the unfair labor practices." Overnite, 329 N.L.R.B. No. 91 at 6 n.26. Citing this principle approvingly, the ALJ stated that "evaluating the situation as of the time of the commission of the unfair labor practices appears better than lengthy, additional hearings to determine employees' subjective states of mind." Id. at 63.

We are persuaded that there is substantial evidence to support the Board's issuance of Gissel orders at each of the four contested service centers. The propriety of those orders is not impugned by several anomalous Union successes elsewhere. Although the issuance of Gissel orders in this case is supported by Overnite's pervasive national and unit-specific violations, the choice of remedy is a matter peculiarly suited for the Board, largely dependent on unit-specific conditions. The Board could reasonably conclude that Overnite's unlawful conduct would have a "continuing impact," warranting issuance of Gissel orders at Lawrenceville, Louisville, Norfolk, and Bridgeton. On the other hand, conditions at service centers where the Union eventually won elections differed in material respects from conditions at the Gissel locations, which allowed Union support to withstand the erosive effects of Overnite's unlawful conduct. That the Union was able to survive Overnite's unfair labor practices-- and its nationwide anti-union animus -- at selected locations does not detract from the Board's finding that such practices have an objective tendency to undermine Union support.

34

IV.

The Supreme Court in <u>Gissel</u> articulated the role of bargaining orders in remedying past election damage, as well as deterring future misconduct. <u>See</u> 395 U.S. at 612. As Justice Harlan observed:

> If an employer has succeeded in undermining a union's strength and destroying the laboratory conditions necessary for a fair election, he may see no need to violate a cease-and-desist order by further unlawful activity. The damage will have been done, and perhaps the only fair way to effectuate employee rights is to re-establish the conditions as they existed before the employer's unlawful campaign.

<u>Id.</u>

This proceeding presents just such a scenario. Faced with Overnite's egregious violations of the Act, the ALJ and the Board concluded that the Category II elements were satisfied at the four contested service centers. The Union had, in each instance, enjoyed pre-election majority status which had been dissipated by Overnite's pervasive misconduct. Because such misconduct left only a slight possibility of ensuring fair elections, the Board determined that employee sentiment would, on balance, be better protected by issuance of <u>Gissel</u> orders. Informed as it was by the Board's unique expertise and by the exhaustive findings of the ALJ, we find the Board's Order supported by substantial evidence, and we decline to disturb it. The petition of Overnite accordingly will be denied, and the Board's cross-application will be granted.

<u>PETITION FOR REVIEW DENIED AND</u>
<u>CROSS-APPLICATION FOR ENFORCEMENT GRANTED</u>

NIEMEYER, Circuit Judge, dissenting:

In representation elections at all four of the Overnite Transportation Company work sites that have been made the subject of this case -- Lawrenceville, Georgia; Louisville, Kentucky; Norfolk, Virginia; and Bridgeton, Missouri -- the Union lost. Finding that the outcomes

35

of these elections were affected by unfair labor practices, the National Labor Relations Board, instead of ordering new elections, issued "category II" <u>Gissel</u> orders, as authorized by <u>NLRB v. Gissel Packing Co.</u>, 395 U.S. 575, 613-14 (1969), directing Overnite to bargain with the Union despite the fact that: (1) the elections had taken place over four years before; (2) approximately 40% of Overnite's workforce had since left its employ; and (3) the Board had certified as fair the elections during the same period at numerous other sites.[1] Explaining why bargaining orders, instead of new elections, were necessary, the Board stated, "it is difficult to believe that the impression made by [Overnite's] barrage of serious unlawful conduct . . . could have dissipated in the minds of those employees . . . and that the virulence of [Overnite's] response to the previous election campaign would not restrain employee free choice in second elections." J.A. 1613.

On review of the Board's order, the majority opinion, rather than reviewing the order against the standards applicable in this circuit for review of <u>Gissel</u> orders, <u>see Be-Lo Stores v. NLRB</u>, 126 F.3d 268 (4th Cir. 1997); <u>NLRB v. Appletree Chevrolet, Inc.</u>, 608 F.2d 988 (4th Cir. 1979) ("<u>Appletree I</u>"), merely reiterated, in expanded form, the Board's position, concluding that it agrees with the Board. Unfortunately, in adopting this approach, the majority has denied Overnite the review to which it is entitled under our precedent. When measured against our precedent, it becomes readily apparent that the Board could not justify, on this record, its determination to issue mandatory bargaining orders in lieu of ordering new elections. <u>See Be-Lo</u>, 126 F.3d at 274-75.

I

It is the strong preference of our national labor policy not to impose collective bargaining representatives on employees except when they have, by a majority vote, elected to be so represented. <u>See NLRB v. Apple Tree Chevrolet, Inc.</u>, 671 F.2d 838, 840 (4th Cir. 1982) ("<u>Apple</u>

_____

[1] The General Counsel had sought <u>Gissel</u> bargaining orders at 17 locations where the Union had lost representation elections, but a settlement resolved most of the disputes. The General Counsel dismissed three or four other complaints because the Union concluded it could win new elections at those sites.

36

Tree II"). Because "an election, not a bargaining order, remains the traditional, as well as the preferred, method for determining the bargaining agent for employees," Appletree I, 608 F.2d at 996, "the extraordinary and drastic remedy of forced bargaining pursuant to [Gissel] is reserved for only the most unusual cases." Be-Lo, 126 F.2d at 273 (internal quotation marks and citations omitted). We have concluded that in this disfavored situation -- where an employer is directed to bargain without the benefit of an election -- the Board must "support its order with detailed record evidence" and not with the recitation of "conclusions by rote without factual explanation." Id. (quoting Appletree I, 608 F.2d at 997). Thus, "[w]hile we accord the Board respect as to its choice of remedies because of its presumed expertise, we exercise less deference and require scrupulous specificity from the Board when it issues mandatory bargaining orders on the authority of [Gissel]." Id. at 274 (internal quotation marks and citations omitted).

II

In this case, the Board did not, and could not on the evidence in the record, fulfill the requirements for scrupulous specificity demanded by our precedents. Indeed, if its analysis had been complete, it would have had to come to terms with the fact that Overnite's national policies could not have supported Gissel orders at four locations when elections were certified as fair at numerous other locations. A few examples of the Board's analysis amply demonstrate its lack of specificity.

It is to be recalled that the elections took place in the spring of 1995. The relevant misconduct took place in that time frame, as well as during Overnite's introduction of a national wage and benefits increase in the spring of 1996. Because several years passed before the Board issued its order directing Overnite to bargain with the Union, the Board was required to "make a detailed analysis assessing the possibility of holding a fair election in terms of any continuing effect of misconduct, and the potential effectiveness of ordinary remedies." Appletree I, 608 F.2d at 997 (internal quotation marks and citations omitted). We noted in Be-Lo that "the adverse effects of all but the most egregious unfair labor practices become dissipated with the passage of time," 126 F.3d at 282 (internal quotation marks and cita-

37

tions omitted), and that the alternative remedy of a new election is much preferred, id. at 274. In this case, the Board could not have found, and did not find, the misconduct so "egregious" as to justify a "category I" Gissel order. It likewise could not and did not conduct the detailed analysis required for a "category II" order. Rather, it dismissed any such requirement with the simple conclusion that it had "considered the inadequacy of other remedies." J.A. 1615; see also J.A. 1614 (containing the Board's comment, without demanding direct evidence, that the passage of time in this case was shorter than that found in other cases to render a Gissel order "stale").

In the same vein, despite our instruction that the Board "carefully analyze, in record findings, the continuing impact" of the 1995-96 violations, Be-Lo, 126 F.3d at 281 (internal quotation marks and citations omitted), the Board could not make such findings on this record where such evidence is lacking. Consequently, the Board simply observed as a matter of logic that the wage increases of 1995 and 1996 "regularly appear in employees' pay checks," and constitute "a continuing reminder that `the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if not obliged.'" J.A. 1611 (quoting NLRB v. Exchange Parts Co., 375 U.S. 405, 409 (1964)). It does not explain how these wage increases could affect some locations -- the four in question here -- but not others where it approved elections in favor of the Union.

Again, on employee turnover, the Board ignored the law of this circuit. In Be-Lo we noted "that significant employee turnover through normal attrition is highly relevant to determining the necessity of a bargaining order and well may make a bargaining order inappropriate." 126 F.3d at 282 (internal quotation marks and citations omitted). We explained that when former employees have moved on and new workers have been hired, the issuance of a bargaining order "risks unjustly binding new employees to the choices made by former ones." Id. at 282-83 (quoting J.L.M., Inc. v. NLRB, 31 F.3d 79, 84 (2d Cir. 1994)). Notwithstanding this state of the law in our circuit, the Board declined to open the record for Overnite's proffered evidence of an employee turnover of approximately 40%. The Board stated that it "traditionally does not consider turnover among bargaining unit employees in determining whether a bargaining order is appropriate." J.A. 1613. It went on to rationalize its decision by concluding gener-

38

ally, again without factual support in the record, that the 60% of the employees who still worked for Overnite would continue to recall the misconduct and "new employees may well be affected by the continuing influence of [Overnite's] past unfair labor practices." J.A. 1613.[2]

Finally, the Board relied on precedent that we have rejected. We have noted that "[a]bsent substantial evidentiary support that the effects of unlawful practices have in fact continued to be felt in the workplace, we believe that such inferences as to the likely effect of `lore of the shop' have no place in the calculus of whether a mandatory bargaining order is warranted." Be-Lo , 126 F.3d at 283. Despite this ruling, the Board has chosen to follow a contrary Fifth Circuit case, Bandag, Inc. v. NLRB, 583 F.2d 765, 772 (5th Cir. 1978), in which that court indicated that "[p]ractices may live on in the lore of the shop and continue to repress employee sentiment long after most, or even all, original participants have departed." The Board relied on this case without even citing the Fourth Circuit's Be-Lo decision, which governed. J.A. 1613.

In short, the Board has explicitly rejected material requirements that we have imposed for issuing Gissel orders in this circuit, and the majority opinion in this case, unfortunately, has not only approved, sub silentio, the Board's approach, it has parroted the Board's conclusory statements in order to affirm.

III

Because Gissel bargaining orders bypass the democratic process, the approval of such drastic orders without satisfying ourselves that new elections could not remedy the unfair labor practices found by the Board leads to an undermining of a fundamental labor law policy of democratic representation. For these reasons I would grant Over-

_____

[2] This generalized statement makes little sense when it is recognized that during the Union's organizing effort, it won eight elections and agreed to dismissal of several of the General Counsel's other Gissel cases because it believed it could win elections at those sites. It won three of four elections in those cases, and at the fourth, where the Union lost by two votes, the Board certified the election as fair.

nite's petition for review and deny the Board's cross-petition for enforcement. Accordingly, I respectfully dissent.

40